COVERT TOWNSHIP ASSESSOR v STATE TAX COMMISSION

Docket Nos. 60345, 60360. Argued October 6, 1978 (Calendar Nos. 4, 5).—Decided February 7, 1980.

The State Tax Commission granted Consumers Power Company tax exemptions for air and water pollution control facilities at its Palisades Nuclear Power Plant in Covert Township, Van Buren County. The Covert Township Administrator challenged the exemptions in administrative and judicial proceedings. The Van Buren Circuit Court, Meyer Warshawsky, J., affirmed the exemptions. The Court of Appeals, R. B. Burns, P.J., and D. E. Holbrook and Breighner, JJ., affirmed as to the air pollution control facilities and reversed as to the water pollution control facilities, holding that the statute at that time exempted them only from personal property taxes, not from real property taxes (Docket Nos. 29782, 29783). Plaintiff and defendant Consumers Power Company appeal. *Held:*

The judgment of the Court of Appeals is affirmed.

1. The fact that no state control, inspection, or review of these facilities is permitted because the Federal government

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 6, 10, 19, 20, 21, 22, 23] 71 Am Jur 2d, State and Local Taxation § 335.5

Validity and construction of statute or ordinance allowing tax exemption for property used in pollution control. 65 ALR3d 434.

[3, 4, 9] 71 Am Jur 2d, State and Local Taxation § 336.

[5] 2 Am Jur 2d, Administrative Law §§ 612, 614.

Legislative power to exempt from taxation property purposes or uses additional to those specified in constitution. 61 ALR2d 1031.

[7] 2 Am Jur 2d, Administrative Law § 657.

[8] 2 Am Jur 2d, Administrative Law § 659.

[11] 71 Am Jur 2d, State and Local Taxation §§ 201, 202.

[12] 71 Am Jur 2d, State and Local Taxation §§ 82, 170 *et seq.*

[13] 71 Am Jur 2d, State and Local Taxation § 307 *et seq.*

[14] 71 Am Jur 2d, State and Local Taxation § 170 *et seq.*

[15] 71 Am Jur 2d, State and Local Taxation § 175 *et seq.*

[16] 73 Am Jur 2d, Statutes §§ 5-7, 43.

[17] 73 Am Jur 2d, Statutes §§ 145, 146, 208.

71 Am Jur 2d, State and Local Taxation § 327.

[18, 24] 71 Am Jur 2d, State and Local Taxation § 326.

has pre-empted the regulation of nuclear facilities does not make them ineligible for tax exemption. The purpose of the Air Pollution Act is to control air pollution in this state. That purpose is served by pollution control facilities constructed within the state whether they are required by Federal or state regulation. It is not regulation that is the *quid pro quo* for the pollution control facility tax exemption, but the control of pollution. It is the fact that pollution control is *provided* that is important rather than whether it is provided in response to state or Federal regulation. If the Legislature had wanted to require more, it could have required that all facilities, to be eligible for the exemption, must be subject to regulation under the Air Pollution Act and rules. Tax exemption can lawfully be granted for air pollution control facilities pursuant to the requirements of the exemption act even though the facilities may not be subject to mandatory inspection, review and control by the state.

2. The plaintiff township argues that the containment building and its component systems were not installed or acquired for the primary purpose of controlling air pollution, but to meet the Federal requirements for licensing of a nuclear plant and to contain discharges which would result from an extraordinary accident at the plant rather than from its normal operation. The use of the words "primary purpose" and "operated primarily for" in the exemption act evidences a legislative concern with the primary purpose *served* by the facility for which exemption is sought. This purpose need not, necessarily, align with the motivation for installing, acquiring or operating the facilities. Furthermore, there is nothing in the exemption act distinguishing between the control of air pollutants resulting from normal operations of the plant and those resulting from an accident. The use of the word "primary" is merely intended to insure that tax exemption is not granted to facilities that, incidental to their primary purpose, serve to control, prevent or abate air pollution.

3. The State Tax Commission's decision that these facilities are suitable and reasonably adequate was based on competent, material and substantial evidence. Their operation can only be fully measured in the event of a serious accident which has not yet occurred, but the suitability and adequacy of many devices and structures can be, and are, measured and tested through nonempirical studies based on accepted scientific principles and sound analysis. The resolution of this question is particularly well-suited to the expertise of the administrative agencies charged with resolving it.

4. Review of the record indicates that radiation itself might

not be an "air contaminant" within the definition of the Air Pollution Act. There is, however, competent, material and substantial evidence to support the State Tax Commission's decision that radioactive materials, such as gases and particulates of the type controlled or disposed of by these facilities, are air contaminants. Therefore, the State Tax Commission's finding that the Palisades containment building, its spray system and cooling system, and the gaseous radioactive waste system qualify as to tax exempt facilities under the exemption statute is supported in the record.

5. The legislative history of the exemption statute makes it clear that the intent of the Legislature was to provide exemption for water pollution control facilities only from personal property taxes because the Legislature deleted a reference to exemption from real property taxes from the original bill. Although the definitions in the act of facilities, treatment works, and disposal systems which may qualify for exemption appear to include many facilities that might normally be classified as real property, these definitions should not be read as redefining real and personal property for purposes of the act. Furthermore, the amendment to the act in 1977 which provided an exemption from real property taxes for water pollution control facilities was not simply intended to clarify the former language of the act; rather, the amendment extended the exemption to real property taxes.

6. There is adequate evidence in the record to determine that the water pollution control facilities are real, not personal, property. The grant of applications for leave to appeal specifically invited the parties to address the issue, and defendant Consumers Power Company failed to take the opportunity to refute the evidence which supports that conclusion. The most compelling evidence is Consumers Power Company's admitted failure to report any portion of these water pollution control facilities on its personal property tax statements for 1974 and 1975, after the tax exemption was granted, although that information is specifically requested on the personal property tax statement. The facilities were carried on the plaintiff's real property tax rolls and the township's assessor testified that Consumers Power Company represented to him that they were real property. Therefore, the Palisades water pollution facilities are real property and were ineligible for tax exemption under the statute before the amendment in 1977 which provided an exemption from real property taxes as well as from personal property taxes for qualifying facilities.

7. The Legislature has power over taxation and tax exemp-

tion and may exercise that power to classify the subjects of taxation in compliance with the Equal Protection Clause of the Constitution of the United States when it is not obviously exercised in a spirit of prejudice or favoritism. The state is not bound by any rigid equality. This rule gives government freedom to meet its exigencies, not binding its actions by rigid formulas, but apportioning its burdens and permitting it to make those discriminations which the best interests of society require. There is no prohibited spirit of prejudice or favoritism here. The Legislature may reasonably have decided that exempting water pollution control facilities from personal property taxes but not from real property taxes would accomplish the act's purpose of encouraging investments in those facilities which the Legislature deemed to be in the public interest. Furthermore, there is no reason for applying a more stringent test under the state constitution. In the face of an equal protection challenge under the United States Constitution, the Court has recognized that tax statutes may discriminate among classifications of properties, businesses, trades, callings or occupations so long as the discrimination is not arbitrary but is based upon a reasonable distinction or if any state of facts can reasonably be conceived to sustain it. Such reasonableness is found in the classification made by the Legislature here. It involves no suspect class or fundamental right and rationally furthers the object of the legislation.

Affirmed.

Justice Moody concurred in the holding that the water pollution control facilities are real property and, therefore, are ineligible for tax exemption under the statute, but he dissented from the holding that the Palisades containment building and its component systems constitute air pollution control facilities covered by the Air Pollution Act. Because the Legislature did not clearly intend to include such facilities within the ambit of the Air Pollution Act, the Palisades Plant does not qualify for a tax exemption.

1. A tax exemption is not to be assumed in any case unless the statutory language would allow no other construction. The legislative intention must be expressed in clear and unmistakable terms, or must appear by necessary implication from the language used, for it is a well-settled principle that, when a specific privilege or exemption is claimed under a statute, charter, or act of incorporation, it is to be construed strictly against the property owner and in favor of the public. This principle applies with peculiar force to a claim of exemption from taxation. Exemptions are never presumed. The burden is

on the claimant to establish clearly his right to exemption, and an alleged grant of exemption will be strictly construed and cannot be made out by inference or implication but must be beyond reasonable doubt.

2. The test for a facility to qualify for a tax exemption as an air pollution control facility is whether 1) the facility is designed and operated primarily for the control, capture and removal of pollutants from the air; 2) it is suitable and reasonably adequate for the control, capture and removal of pollutants from the air; and 3) it is one which the Legislature intended to be covered by the Air Pollution Act. Discussion of the first two elements of the test is unnecessary because defendant Consumers has failed to satisfy the third.

3. The Legislature, in the Air Pollution Act, has given a very broad, general definition to the term "air pollution". Whether the Legislature intended that radiation or radioactive emissions be included as "air pollution" is not clear. The Legislature has left to the Air Pollution Control Commission the duty of administering the act, and setting up rules and regulations for compliance with the act. The commission has established extensive regulations and procedures for checking the emission of air contaminants and has also compiled a "register of materials", which consists of chemical or particulate contaminants which if found in sufficient quantities in the ambient air can endanger the health and safety of the people. Nowhere in the regulations is there any mention of nuclear power plants or nuclear power facilities. Nor is there in the register of materials any mention of radiation, or of alpha particles, beta particles or gamma rays, which constitute the emissions that may be released by a nuclear facility. It would stretch the bounds of logic to assume that the Legislature or the Air Pollution Control Commission by their silence intended to cover these facilities or materials under the Air Pollution Act.

4. Defendant Consumers argues that the reason for the silence or inaction by the Legislature and the Air Pollution Control Commission is that the whole field of regulation regarding radioactive materials and radiation hazards has been preempted by the Federal government. This argument could be answered with the assertion that, since the Legislature may have been convinced of Federal pre-emption, it certainly had no intention to cover nuclear facilities by the Air Pollution Act. However, this contention must also fail for two other reasons. First, even a cursory examination of the overall legislative scheme of the Air Pollution Act demonstrates that the Legislature intended to regulate in the field of air pollution. The whole

act is regulatory in nature. The Legislature delegated important regulatory powers and authority to the Air Pollution Control Commission and also provided sanctions for violations of the act. It is difficult to conceive that the Legislature would establish such an extensive regulatory structure and then reward with a tax exemption a facility which has no obligation to comply with the regulations of the Air Pollution Act. Second, it is very misleading to say that the Legislature is completely pre-empted from regulating in the field of nuclear power or radiation control. It is true that the United States Court of Appeals has held that the Federal government has exclusive authority under the doctrine of pre-emption to regulate the construction and operation of nuclear power plants and that this authority includes regulation of the levels of radioactive effluents discharged from the plant and precludes such regulation by the states. However, the Court also made clear that the states were not totally precluded and could regulate for purposes other than protection from radiation hazards. The Michigan Court of Appeals has reached a similar conclusion by recognizing Federal pre-emption but noting that the state could regulate non-radiological hazards through its police power and even suggesting means by which the state could exercise its police powers over the nuclear power industry, *e.g.,* local building codes, non-discriminatory zoning requirements, and abatement of common-law nuisances. Several other states have taken steps to regulate the nuclear power industry and even radiation hazards. Further, the whole issue of Federal pre-emption may be moot because of the 1977 amendments to the Federal Clean Air Act which delegate to the Environmental Protection Agency authority over the control of radioactive pollutants but also delegate to the states the authority to regulate any air pollutants as defined under the act.

5. Despite having the apparent authority to do so, the Legislature and the Air Pollution Control Commission have taken absolutely no action to regulate radiation and nuclear power plants under the Air Pollution Control Act. It can hardly be said that defendant Consumers is entitled to an air pollution facility tax exemption when the Legislature has clearly declined to include the Palisades facilities under the regulatory control of the Air Pollution Act. The intent and purposes of the Air Pollution Act do not encompass radiation hazards. The Legislature has, however, taken direct, positive steps to regulate radioactive emissions through another act, the Radiation Control Act, which has been re-enacted as a part of the Public Health Code. It is clear that this is the instrument which the

Legislature intended to use for the regulation and control of radioactive emissions. This act, unlike the Air Exemption Act, provides no tax exemption for compliance with it. Nor is there mention made in the Air Exemption Act that a tax exemption will be given for compliance with the intent and purposes of the Radiation Control Act.

6. The nature of the facilities in this case presents serious problems of proof in determining whether they would qualify for a tax exemption, even if the Air Pollution Act were applicable to nuclear power plants. The Director of Public Health and the State Tax Commission must rely primarily on the statements and evidence presented by the party requesting the tax exemption. Such evidence may be self-serving, and without an independent method of verification of it, there is no reasonable basis upon which the Director of Public Health can make an objective and informed decision whether the facilities adequately prevent the release of radioactive emissions into the air. The fact that, based upon this same evidence, the Nuclear Regulatory Commission licensed the nuclear plant and determined that the facilities were environmentally sound and posed no threat to the public health and safety from radioactive emissions does not demonstrate that the evidence is reliable. The enforcement of the Federal Atomic Energy Act is susceptible to inherent conflicts because it has two purposes: to promote the growth and expansion of the nuclear power industry, and to insure that the public health and safety is protected. In balancing the two purposes, the promotional factor almost always wins. Furthermore, the Federal courts and commentators have been highly critical of the reliability in general of the environmental decisions by the Nuclear Regulatory Commission. For example, the NRC insists that the risk of a "nuclear catastrophe" is slim, but there is no scientific or mathematical support for that conclusion. Therefore, the decision of the Director of Public Health could only be based on conjecture. Under the rule that tax-exemption statutes must be strictly construed, conjecture cannot form the basis for a decision to grant a tax exemption.

77 Mich App 626; 259 NW2d 164 (1977) affirmed.

OPINION OF THE COURT

1. TAXATION — EXEMPTIONS — AIR POLLUTION CONTROL — STATE CONTROL.

No state control, inspection, or review of air pollution control facilities is required in order for such facilities to meet the intent and purpose of the Air Pollution Act and thereby qualify

for an exemption from real and personal property taxes (MCL 336.3, 336.11 *et seq.;* MSA 7.793[3], 14.58[1] *et seq.).*

2. Taxation — Exemptions — Air Pollution Control — Legisla-
   tive Purpose.

   The intent and purpose of the Air Pollution Act, which is incorpo-
   rated by reference in the statutory requirements to obtain a
   tax exemption for air pollution control facilities, is to control
   air pollution in Michigan; the act itself contemplates that
   Federal agencies or other governmental units may have author-
   ity to control air pollution in this state and the Air Pollution
   Control Commission need not have control over all activities
   regulating air pollution but may cooperate with other agencies
   or governmental units to meet the act's purpose (MCL 336.3,
   336.11 *et seq.;* MSA 7.793[3], 14.58[1] *et seq.).*

3. Taxation — Exemptions — Air Pollution Control — Primary
   Purpose.

   Providing air pollution control is the important consideration in
   meeting the statutory requirements to obtain a tax exemption
   for air pollution control facilities; therefore, the primary pur-
   pose served for which exemption is sought need not, necessar-
   ily, be the same as the motivation for installing, acquiring or
   operating the facilities, *e.g.,* in response to state or Federal
   regulation (MCL 336.3, 336.11 *et seq.;* MSA 7.793[3], 14.58[1] *et
   seq.).*

4. Taxation — Exemptions — Air Pollution Control — Primary
   Purpose — Words and Phrases.

   The use of the words "primary purpose" and "operated primarily
   for" in the statutory requirements to obtain tax exemption for
   air pollution facilities is intended to insure that tax exemption
   is not granted to facilities that, incidental to their primary
   purpose, serve to control air pollution; it does not show a
   legislative intent to distinguish between control of air pollu-
   tants resulting from normal operations of the taxpayer's enter-
   prise and those resulting from an accident (MCL 336.1, 336.3,
   336.11 *et seq.;* MSA 7.793[1], 7.793[3], 14.58[1] *et seq.).*

5. Taxation — Exemptions — State Tax Commission — Adminis-
   trative Procedures Act — Appeal and Error.

   The scope of review of the grant of tax exemption certificates by
   the State Tax Commission is necessarily limited to a determi-
   nation whether the commission's decision is supported by com-
   petent, material and substantial evidence on the whole record
   as required by the Administrative Procedures Act, where there

was no error in the State Tax Commission's interpretation of the pertinent statutory language (MCL 24.306[1][d]; MSA 3.560[206][1][d]).

6. TAXATION — EXEMPTIONS — AIR POLLUTION CONTROL — ADEQUACY — EVIDENCE.

The suitability and adequacy of air pollution control facilities for which tax exemption is sought may be shown through nonempirical studies based on accepted scientific principles and sound analysis where the actual operation of the facilities can only be directly measured in the event of a serious accident which has not yet occurred (MCL 336.3; MSA 7.793[3]).

7. TAXATION — EXEMPTIONS — AIR POLLUTION CONTROL — ADEQUACY — ADMINISTRATIVE LAW.

The suitability and adequacy of air pollution control facilities for which tax exemption is sought are questions which are left to the expertise of the administrative agencies charged with deciding them; the decision of the State Tax Commission on this question will not be reversed on appeal where it was based on competent, material and substantial evidence (MCL 336.3; MSA 7.793[3]).

8. TAXATION — EXEMPTIONS — AIR POLLUTION CONTROL — CONTAMINATION — RADIATION — WORDS AND PHRASES.

Radiation itself might not necessarily be an "air contaminant" within the definition of the Air Pollution Act; however, there was competent, material and substantial evidence to support a finding of the State Tax Commission, in reviewing a tax exemption for air pollution control facilities at a nuclear power plant, that radioactive materials, such as gases and particulates, of the type controlled by those air pollution control facilities are air contaminants (MCL 336.3, 336.12; MSA 7.793[3], 14.58[2]).

9. TAXATION — EXEMPTION — WATER POLLUTION CONTROL — REAL PROPERTY — PERSONAL PROPERTY.

Water pollution control facilities were eligible for exemption from personal property taxes only, prior to the effective date of an amendatory act which provided an exemption to qualifying facilities from real property taxes as well as personal property taxes; the Legislature did not attempt to redefine the term "personal property" in the statutory requirements for the exemption (1977 PA 282; MCL 323.354[1]; MSA 7.793[54][1]).

10. TAXATION — REAL PROPERTY TAXES — PERSONAL PROPERTY TAXES — EXEMPTIONS — WATER POLLUTION CONTROL.

The 1977 amendment of the statute granting exemption from

real property taxes for certain water pollution control facilities was not simply intended to clarify the purpose of the statute as it was before the amendment; rather, the amendment extended the exemption to real property taxes (1977 PA 282).

11. TAXATION — PERSONAL PROPERTY TAXES — EXEMPTIONS — WATER POLLUTION CONTROL — REAL PROPERTY.

There was adequate evidence in the record to determine that water pollution control facilities at a taxpayer's nuclear plant were real property and thereby ineligible for a tax exemption under the former statute where the taxpayer admittedly failed to report any portion of these facilities on its personal property tax statement for the pertinent tax years, the township assessor placed the partially constructed facilities on the township real property tax roll, the taxpayer represented to the assessor that the facility was real property, and the taxpayer has failed to refute that conclusion although it was given the opportunity to do so (MCL 323.354[1]; MSA 7.793[54][1]).

12. TAXATION — STATUTES — EQUAL PROTECTION.

The Legislature has power over the subjects of taxation and exemption from it, which implies the power of discrimination in classifying those subjects, so long as the power is not exercised in the spirit of prejudice or favoritism; the state is not bound by any rigid equality but the power must not be exercised in clear and hostile discrimination between particular persons and classes (US Const, Am XIV; Const 1963, art 1, § 2).

13. TAXATION — EXEMPTION — PERSONAL PROPERTY TAXES — REAL PROPERTY TAXES — WATER POLLUTION CONTROL — EQUAL PROTECTION.

No constitutionally prohibited spirit of prejudice or favoritism is found in a statute which exempted water pollution control facilities from personal property taxes but not from real property taxes; the Legislature may reasonably have decided that the exemption from personal property taxes only would accomplish the statute's purpose of encouraging investments in those facilities which the Legislature deemed to be in the public interest, and the classification involves no suspect class or fundamental right (US Const, Am XIV; Const 1963, art 1, § 2; MCL 323.354[1]; MSA 7.793[54][1]).

14. TAXATION — REAL PROPERTY TAXES — PERSONAL PROPERTY TAXES — EQUAL PROTECTION.

It is the usual course in tax laws to treat personal property as

one class and real property as another, which has never been supposed to create illegal discrimination because there might be some persons who owned only personal property and others who owned property of both classes (US Const, Am XIV; Const 1963, art 1, § 2).

15. TAXATION — STATUTES — EQUAL PROTECTION.

Tax statutes may discriminate among classifications of properties, businesses, trades, callings or occupations so long as the discrimination is not arbitrary but is based upon a reasonable distinction or if any state of facts can reasonably be conceived to sustain it (US Const, Am XIV; Const 1963, art 1, § 2).

16. STATUTES — EQUAL PROTECTION.

A legislative classification will be upheld in the face of an equal protection challenge under the constitution if it rationally furthers the object of the legislation and involves neither a suspect class nor fundamental rights (US Const, Am XIV; Const 1963, art 1, § 2).

OPINION CONCURRING IN PART AND DISSENTING IN PART BY BLAIR MOODY, JR., J.

17. TAXATION — EXEMPTIONS — STATUTES — CONSTRUCTION.

*A tax exemption is not to be assumed in any case unless the statutory language would allow no other construction; the legislative intention must be expressed in clear and unmistakable terms, or must appear by necessary implication from the language used.*

18. TAXATION — EXEMPTIONS — STATUTES — CONSTRUCTION.

*The well-settled principle that, when a specific privilege or exemption is claimed under a statute, charter, or act of incorporation, it is to be construed strictly against the property owner and in favor of the public applies with peculiar force to a claim of exemption from taxation.*

19. TAXATION — EXEMPTIONS — AIR POLLUTION.

*The test for a facility to qualify for a tax exemption as an air pollution control facility is whether: 1) the facility is designed and operated primarily for the control, capture and removal of pollutants from the air; 2) it is suitable and reasonably adequate for the control, capture and removal of pollutants from the air; and 3) it is one which the Legislature intended to be covered by the Air Pollution Act (MCL 336.1 et seq., 336.11 et seq.; MSA 7.793[1] et seq., 14.58[1] et seq.).*

20. HEALTH AND ENVIRONMENT — AIR POLLUTION — RADIATION CONTROL — WORDS AND PHRASES.

*The Legislature, in the Air Pollution Act, has given a very broad, general definition to the term "air pollution"; whether it intended that radiation or radioactive emissions be included as "air pollution" is not clear, but it has left to the Air Pollution Control Commission the duty of administering the act and setting up rules and regulations for compliance with the act (MCL 336.11 et seq.; MSA 14.58[1] et seq.).*

21. HEALTH AND ENVIRONMENT — AIR POLLUTION — RADIATION CONTROL — NUCLEAR POWER.

*The Air Pollution Control Commission has established extensive rules and regulations for compliance with the Air Pollution Act but nowhere in the regulations or "register of materials", chemical or particulate contaminants which if found in sufficient quantities in the ambient air can endanger the health and safety of the people, is there any mention of nuclear power plants or nuclear power facilities, or any mention of the radiation and emissions that may be released by a nuclear facility; it would stretch the bounds of logic to assume that the Legislature or the Air Pollution Control Commission by their silence intended to cover these facilities or materials under the Air Pollution Act (MCL 336.11 et seq.; MSA 14.58[1] et seq.).*

22. TAXATION — EXEMPTIONS — AIR POLLUTION — RADIATION CONTROL — NUCLEAR POWER.

*The Legislature and the Air Pollution Control Commission, despite having the apparent authority to do so, have taken absolutely no action to regulate radiation and nuclear power plants under the Air Pollution Act; it can hardly be said that a taxpayer which owns and operates a nuclear power plant with radiation control facilities is entitled to an air pollution facility tax exemption when the Legislature has declined to include the facilities under the regulatory control of the Air Pollution Act (MCL 336.1 et seq., 336.11 et seq.; MSA 7.793[1] et seq., 14.58[1] et seq.).*

23. HEALTH AND ENVIRONMENT — AIR POLLUTION — RADIATION CONTROL.

*The intent and purposes of the Air Pollution Act do not encompass radiation hazards; the Legislature has, however, taken direct positive steps to regulate radioactive emissions through another act, the Radiation Control Act, which has been reenacted as a part of the Public Health Code, and that is clearly the instrument which the Legislature intended to use for the*

*regulation and control of radioactive emission (MCL 333.13501*
*et seq., 336.11 et seq.; MSA 14.15[13501] et seq., 14.58[1] et seq.).*

24. TAXATION — EXEMPTIONS — AIR POLLUTION — RADIATION CON-
TROL — NUCLEAR POWER.

*Conjecture cannot form the basis for a decision by the Director of*
*Public Health and the State Tax Commission to grant a tax*
*exemption to the radiation control facilities of a nuclear power*
*plant primarily on the basis of information presented by the*
*party requesting the tax exemption because it would violate the*
*rule that tax-exemption statutes must be strictly construed*
*(MCL 336.1 et seq., 336.11 et seq.; MSA 7.793[1] et seq., 14.58[1]*
*et seq.).*

*Bauckham, Reed, Lang, Schaefer & Travis* for
plaintiff.

*Lawrence B. Lindemer* and *Robert J. Byers* and
*Dykema, Gossett, Spencer, Goodnow & Trigg* (by
*James D. Tracy, John W. Voelpel,* and *Robert H.*
*Gorlin)* for defendant Consumers Power Company.

Amicus Curiae:

*Honigman, Miller, Schwartz & Cohn (Avern*
*Cohn, John Sklar,* and *Joseph M. Polito,* of coun-
sel) and *Leon S. Cohan* and *Milton B. Pollock* for
The Detroit Edison Company.

RYAN, J. These two cases were consolidated for
the purpose of hearing and decision. They involve
the validity of certain tax exemption certificates
issued by the State Tax Commission to Consumers
Power Company covering both air pollution and
water pollution control facilities located at the
Palisades Nuclear Power Plant in Covert Town-
ship, Van Buren County.

In 1968, Consumers applied to the tax commis-
sion for tax exemption certificates pursuant to
MCL 336.1 *et seq.;* MSA 7.793(1) *et seq.,* hereafter
the Air Exemption Act, which provides for the

exemption of air pollution control facilities from certain taxes. The application sought exemption for the containment building which houses the nuclear reactor at the power plant, the building's spray system, the building's cooling system and the facility's gaseous radioactive waste (radwaste) system.

In 1972, Consumers applied to the tax commission for tax exemption certificates pursuant to MCL 323.351 *et seq.;* MSA 7.793(51) *et seq.,* hereafter the Water Exemption Act, which provides for the exemption of water pollution control facilities from certain taxes. These applications sought exemption for the power plant's liquid radioactive waste (radwaste) system and water cooling towers.

The commission granted each of the exemptions.[1]

Following this action by the commission, the Covert Township assessor pursued various administrative actions and judicial proceedings,[2] chal-

_____

[1] The total exemption granted for the air pollution control facilities was less than the amount claimed exempt by Consumers Power. The commission deducted an amount from that claimed by Consumers which represented the cost of a conventional building that would simply have provided weather housing for the reactor, as well as the cost that would have been saved had Consumers placed certain radiation shielding closer to the reactor. In the opinion of the Division of Air Pollution Control of the Public Health Department, these costs did not qualify for the statutory exemption.

[2] This litigation has an involved history that is not necessarily pertinent to the issues addressed today, but which is briefly recounted for purposes of clarifying the background of these cases.

In May, 1968, Consumers Power Company applied for an exemption for the Palisades plant's containment building as well as the building's spray system, the building's cooling system and the facility's gaseous radwaste system. The original application was denied, but an amended application was approved in January, 1972. The Covert Township assessor then sought leave to appeal this decision in the Court of Appeals. In May, 1974, the Court of Appeals decided that appellate jurisdiction over this matter was vested in the circuit court and remanded the appeal to the Thirty-Sixth Judicial Circuit for consideration on the merits. *Covert Twp Assessor v State Tax Commission,* 53 Mich App 300; 218 NW2d 807 (1974).

In the fall of 1972, Consumers Power filed two applications for tax

lenging the exemptions. The circuit court finally affirmed the commission's grant of the tax exemption certificates. The Court of Appeals affirmed the tax exemption for the air pollution control facilities, but reversed as to the tax exemption for the water pollution control facilities. *Covert Twp Assessor v State Tax Commission,* 77 Mich App 626; 259 NW2d 164 (1977).

We granted leave to appeal. 402 Mich 882; 262 NW2d 298 (1978). We affirm.

## I. AIR POLLUTION CONTROL FACILITIES

We granted leave to appeal on two specific questions concerning the exemptions for the air pollution control facilities:

"(1) [W]hether tax exemption can be granted pursu-

exemption under the Water Exemption Act for the liquid radwaste system and the cooling towers located at the Palisades plant. Both of these applications were granted in September, 1973. The Covert Township assessor appealed this decision to the Court of Appeals and that court determined that appellate jurisdiction was vested in circuit court and remanded to the Thirty-Sixth Judicial Circuit on the authority of the Air Exemption Act case, on September 9, 1974.

Thereafter, Consumers Power, the assessor and the State Tax Commission stipulated in circuit court for entry of an order remanding both of these cases to the State Tax Commission for determination of certain stipulated issues concerning the tax exemption certificates issued for both the air pollution and water pollution control facilities at the Palisades plant. On the same day, orders for partial summary judgment were entered by the circuit court which provided, in part, that the final determination of this proceeding would determine the validity and effect of the air and water pollution control facilities exemption certificates for the tax year 1974 and all subsequent years in which the facts and the law remained unchanged.

On July 9, 1975, the State Tax Commission issued its order affirming both the air pollution control exemption certificate and the water pollution control exemption certificate. This decision was affirmed by the circuit court in an order filed July 30, 1976, following a written opinion filed June 23, 1976.

The Court of Appeals affirmed the tax exemption for the air pollution control facilities but reversed as to the tax exemption for the water pollution control facilities. *Covert Twp Assessor v State Tax Commission,* 77 Mich App 626; 259 NW2d 164 (1977).

ant to 1965 PA 250 as amended [the Air Exemption Act] to nuclear facilities that are not subject to mandatory inspection, review and control by an agency or agencies of the State of Michigan;

"(2) whether the containment building, the containment building spray system, the containment building cooling system and the gaseous radwaste system of Consumers Power Company meet the statutory requirements so as to qualify as tax exempt facilities under 1965 PA 250." 402 Mich 882.

We answer both questions in the affirmative.

## A. State Inspection, Review, Control

The Air Exemption Act empowers the tax commission to issue a certificate exempting certain facilities from real and personal property taxes[3]

"[i]f the director of public health finds that the facility is designed and operated primarily for the control, capture and removal of pollutants from the air, and is suitable, reasonably adequate and meets the intent and purpose of the air pollution act, Act No. 348 of the Public Acts of 1965, as amended, being sections 336.11 to 336.36 of the Compiled Laws of 1948, and rules promulgated thereunder * * *." MCL 336.3; MSA 7.793(3).

At the time application for this exemption was made, a "facility" was defined, for purposes of the Air Exemption Act, to mean:

"machinery, equipment, structures, or any part or accessories thereof, installed or acquired for the primary purpose of controlling or disposing of air pollution which if released would render the air harmful or inimical to the public health or to property within this state. It does not include an air conditioner, dust collec-

[3] MCL 336.4; MSA 7.793(4).

tor, fan or other similar facility for the benefit of personnel or of a business." MCL 336.1; MSA 7.793(1).

The township contends that the Palisades plant's air pollution control facilities cannot qualify for tax exemption unless they are subject to control and continuing inspection and review by a state agency, because such control, inspection and review is necessary to meet the intent and purpose of the Air Pollution Act, and the rules promulgated under that act, as required by MCL 336.3; MSA 7.793(3). Yet, no state control, inspection or review of these facilities is permitted because the Federal government has preempted the regulation of nuclear facilities. *Northern States Power Co v Minnesota*, 447 F2d 1143 (CA 8, 1971), *aff'd without opinion* 405 US 1035; 92 S Ct 1307; 31 L Ed 2d 576 (1972). Therefore, the township concludes, no tax exemption can lawfully be granted.

We do not agree. Our review of the Air Pollution Act, MCL 336.11 *et seq.;* MSA 14.58(1) *et seq.,* compels the conclusion that no state control, inspection or review of air pollution control facilities is required in order for such facilities to meet the intent and purpose of that act. The intent and purpose of the act is manifest in its statutory language. The title to that act provides, in pertinent part, that it is "[a]n act to control air pollution in this state * * *".

Air pollution was defined, with certain narrow exceptions not applicable here, to mean:

"[T]he presence in the outdoor atmosphere of air contaminants in quantities, of characteristics and under conditions and circumstances and of a duration which are injurious to human life or property or which unreasonably interfere with the enjoyment of life and property, and which are reasonably detrimental to plant

and animal life in this state * * *." MCL 336.12; MSA 14.58(2).

Another section of the act provides, in part:

"It is the purpose of this act to provide additional and cumulative remedies to prevent and abate air pollution. Nothing in this act contained shall abridge or alter rights of action or remedies now or hereafter existing, nor shall any provision of this act or anything done by virtue of this act be construed as estopping * * * other governmental units from the exercise of their respective rights to suppress nuisances or to prevent or abate air pollution." MCL 336.34; MSA 14.58(24).

Finally, among its statutory powers, we note that the Air Pollution Control Commission is given the authority to "[c]ooperate with the appropriate agencies of the United States * * * with respect to the control of air pollution * * *." MCL 336.15(n); MSA 14.58(5)(n).

Contrary to the contention of the township, we find that the intent and purpose of this act is to control air pollution in the state; that the act itself contemplates that Federal agencies or other governmental units may have authority over the control of air pollution in the state; and that the commission need not have control over all activities regulating air pollution but may cooperate with other agencies or governmental units to meet the act's purpose of preventing and abating air pollution.

We agree with the holding of the tax commission below that:

"The intent and purposes of the Air Pollution Act and Rules * * * are to control pollution and thereby to protect the health, welfare and safety of Michigan citizens, the productive capability of the assets of those

citizens, and the natural resources of the State. That intent and those purposes are served by pollution control facilities constructed within the State of Michigan whether required by reason of federal or state regulation. Compatibility with intent and purposes is not dependent upon regulation. Such compatibility is established by the ability of a facility to control pollution. It is not regulation that is the *quid pro quo* for tax exemption. That *quid pro quo* is the control of pollution and, thereby, the protection of the health, welfare and safety of Michigan citizens and their assets. It is the fact that pollution control is *provided* that is important and not whether that pollution control is provided in response to state or federal regulation. If the Legislature had wanted to require more, it would have been a simple matter to require that all facilities eligible for exemption be *subject* to regulation under * * * the air pollution control act and rules * * *." (Emphasis in original.)

We conclude that tax exemption can lawfully be granted for air pollution control facilities pursuant to the requirements of the Air Exemption Act even though such facilities may not be subject to mandatory inspection, review and control by the state.

## B. Qualifying for Tax Exemption

The township next contends that the various facilities for which tax exemption was granted do not qualify under the Air Exemption Act as tax exempt facilities. Specifically, the township contends that these facilities were not installed or acquired for the primary purpose of controlling or disposing of air pollution, MCL 336.1; MSA 7.793(1); that the facilities are not designed and operated primarily for the control, capture and removal of pollutants from the air; that the facilities are not suitable and reasonably adequate for

such purposes; and that the facilities do not meet the intent and purposes of the Air Pollution Act and rules promulgated thereunder, MCL 336.3; MSA 7.793(3).

We disagree with each of these contentions.

The first two contentions are based on similar reasoning. It is the position of the township that the containment building and its component systems were not installed or acquired for the primary purpose of controlling or disposing of air pollution, and were not designed and operated primarily for the control, capture and removal of pollutants from the air. Rather, the primary purpose for the installation, acquisition, design and operation of these facilities was to meet the requirements of the Federal government in order to obtain an operating license for the nuclear power plant. Further, the township argues that the use of the word "primary" indicates that tax exempt status may be granted only to those facilities which are installed or acquired for the purpose of capturing and removing air pollutants during normal plant operations. Because the type of facilities installed at the Palisades plant are designed to specifications intended to contain discharges resulting from an accident having a probability of occurrence of 1 in 17,000 per year, the primary purpose of the installation, acquisition, design and operation of these facilities does not comport with the statutory requirement.

Neither of these arguments can be sustained. The use of the words "primary purpose" in § 1, and "operated primarily for" in § 3 of the Air Exemption Act[4] evidences a legislative concern with the primary purpose served by the facility for which exemption is sought. This purpose need not,

---

[4] MCL 336.1; MSA 7.793(1) and MCL 336.3; MSA 7.793(3).

necessarily, align with the motivation of the persons installing, acquiring or operating the facilities.

As to the township's second argument, we find nothing in the language of the Air Exemption Act drawing a distinction between the control of air pollutants resulting from normal operations of the plant, and those resulting from an accident. We do not agree that the use of the word "primary" indicates a legislative intent to draw such a distinction. Rather, we find the use of the word "primary" in these sections of the act is intended to insure that tax exemption is not granted to facilities that, incidental to their primary purpose, serve to control, prevent or abate air pollution.

Because there is no error in the commission's interpretation of this statutory language, the scope of our review is necessarily limited to a determination whether the commission's decision is supported by competent, material and substantial evidence on the whole record,[5] as required by the

---

[5] At the commission hearing, witness Keeley, at that time the Director of Quality Assurance Services for Consumers Power Company, described the function of the containment building:

"The principal purpose [of the containment building], as far as I'm concerned, is to, number one, contain the fission products that result from various postulated conditions, these being accidents of various severity, and also to contain fission products that are released from the nuclear steam supply system during normal operation, and under the worst assumed accident condition, to contain the water-steam mixture that occurs when the design basis accident occurs and the fission products that occur after this design basis accident."

Witness Keeley further testified that the purpose of the containment building's spray and cooling systems was to assure the integrity of the containment building through reduction of temperature and pressure in the event of an accident. Finally, witness Keeley testified that the gaseous radwaste system contained waste gases resulting from the operation of the reactor in "hold-up" tanks until the radioactivity being emitted by the fission gases decayed to a point at which the gases could safely be released into the environment.

The testimony of Covert Township's witness Lapp, an energy consultant with primary emphasis on nuclear power systems, was in accord with witness Keeley's testimony. Concerning the containment

Administrative Procedures Act, MCL 24.306(1)(d); MSA 3.560(206)(1)(d). We conclude that it is.

The township next contends that whether these facilities are "suitable", and "reasonably adequate" under MCL 336.3; MSA 7.793(3) is a matter yet unproved. The township apparently bases this contention on the ground that these statutory requirements can only be met by measuring and ascertaining the effectiveness of the facilities in actual operation. Because the operation of these facilities can only be fully measured in the event of a serious accident which has not yet occurred, the township argues that the facilities' suitability and reasonable adequacy cannot be established so as to qualify for exemption.

Again, we disagree. The suitability and adequacy of many devices and structures to serve a given purpose can be, and are, measured and tested through non-empirical studies based on accepted scientific principles and sound analysis. We agree with Consumers that the resolution of this question is particularly well-suited to the expertise of the administrative agencies charged with assessing the technical suitability and adequacy of facilities for which exemption is sought. Our review of the record indicates that the commission's decision that these facilities are suitable and reasonably adequate was based on competent, material and substantial evidence.[6]

building, witness Lapp said, "The primary purpose of the containment building is to prevent the release of radioactive material to the environment in the event of an accident." His testimony concerning the building's spray and cooling systems as well as the gaseous radwaste system were similarly in agreement with the testimony of witness Keeley.

[6] Illustrative of the testimony concerning the suitability and reasonable adequacy of these facilities was the following statement of witness Lapp:

"In the event of an accident of this kind, a loss of cooling accident, and a failure of emergency core cooling, you would have these *[sic]*

Finally, the township contends that these facilities do not meet the intent and purposes of the Air Pollution Act, as required under MCL 336.3; MSA 7.793(3), for two reasons.

First, in order to meet the intent and purposes of the Air Pollution Act, the township argues that these facilities must be subject to control and continuing inspection and review by a state agency. We have already resolved this argument against the township.

Second, the township argues that the failure to mention radiation in the definition of "air contaminant" in the Air Pollution Act indicates that the intent and purposes of that act were not to control and prevent the type of pollution that may occur at the Palisades plant. The pertinent section of the act provides:

"(b) 'Air contaminant' means a dust, fume, gas, mist, odor, smoke, vapor or any combination thereof." MCL 336.12; MSA 14.58(2).

While our review of the record indicates that radiation per se might not be an air contaminant within this definition, there is competent, material and substantial evidence to support the commission's decision that radioactive materials, of the

pressurization of the atmosphere within containment. It would get hot and it would raise in pressure. The reactor at the Palisades is sized to, I believe, sustain 55 pounds per square inch of pressure and 285 degrees Fahrenheit temperature.

"We have had accidents in which containment has been pressurized, in which pressures have gone up to 20 pounds per square inch and temperatures have gone up to over 300 degrees Fahrenheit.

*"Containment has been tested and it works. There is no doubt about that."* (Emphasis added.)

Witness Keeley's testimony was that the design of the containment building involved the assumption of the most severe accident (a full core meltdown) and that the containment structure is necessary to meet limitations on radioactive emissions under either normal operating or accident conditions.

type controlled or disposed of by these facilities,
are air contaminants.[7]

[7] In a memo admitted into evidence at the commission hearing,
from the Air Pollution Control Division of the Department of Natural
Resources to the State Tax Commission, the Division stated:

"It is the opinion of the Air Pollution Control Division, Michigan
Department of Natural Resources, that the definition of air contami-
nants includes radioactive materials such as gases and particulates
but does not include radiation itself."

Consumers Senior Health Physicist, witness Sinderman, testified on
direct examination before the commission:

"Q. Would you look at page 76 of the record?

"A. Yes.

"Q. What does that show?

"A. That shows—that is table 11-4, and it is entitled, 'Activity in
Coolant and Gaseous Waste.' It essentially shows the seven krypton
and xenon radio nuclid[es] and their concentration in various portions
of the gaseous radwaste system.

"Q. Are those all radioactive gases?

"A. Yes.

"Q. All right. If they were permitted to get outside the containment
into the environment, would they all contribute to a radiation dose to
an individual who might be at the site boundary?

"A. If these materials are released to the environment, because
they are radioactive, they emit radiation, and as a result would
contribute to the exposure or dose to a person in the vicinity of those
gases, yes.

"Q. All right. If you were operating with the amount of failed fuel
that you license—excuse me—the Palisades Plant operating license
permitted you to operate with, assuming no holdup in the gaseous
radioactive waste system, would you release radioactive materials to
the environment?

"A. Yes.

"Q. All right. What nature? Would they—would they all be gases?

"A. May I ask you a question? Are we speaking specifically of
gaseous radwaste system at this point?

"Q. Yes.

"A. No, they would not. They would be the gases, and the operation
of the plant to date has shown there would be particulates, some of
the other fission products that are not gases, and even some of these
gases decay to what are called daughter products that are also
radioactive and are particulate in nature.

"Q. *Are those particulates respirable?*

"A. *Yes.*

"Q. *What is your definition of respirable?*

"A. *My definition of respirable is a particle that is sufficiently small
to enter the respiratory tract, but sufficiently large so it is retained in
the tract and not exhaled.* And I believe that is essentially the
definition given to this Commission by Mr. Jager." (Emphasis added.)
See, also, Appendix, pp 910a-924a.

We conclude that there is competent, material and substantial evidence on the whole record to support the commission's finding that the Palisades containment building, the containment building spray system, the containment building cooling system and the gaseous radwaste system meet the statutory requirements to qualify as tax exempt facilities under the Air Exemption Act.

## II. WATER POLLUTION CONTROL FACILITIES

Leave to appeal was granted in this case limited to the following specific questions concerning the Palisades water pollution control facilities:

"(1) [W]hether the liquid radwaste system and the cooling towers at the Consumers Power Palisades plant are real property and are ineligible for tax exemption under 1966 PA 222 [the Water Exemption Act];

"(2) whether the water pollution control facilities exemption act as construed to exempt from property taxation personal property used for control of water pollution, but not to exempt real property used for the same purpose, violates the Equal Protection Clause of the Michigan and United States Constitutions." 402 Mich 882.

We find the Palisades water pollution facilities are real property and ineligible for tax exemption under the Water Exemption Act for all applicable tax years preceding 1977 PA 282 which amended the act to provide an exemption to qualifying facilities from real property taxes as well as personal property taxes.

Further, we find that our construction of the

Portions of witness Lapp's testimony could also support a finding by the commission that the radioactive materials controlled and disposed of by these facilities constituted air contaminants (Appendix, pp 614a–629a).

Water Exemption Act does not violate the Equal Protection Clauses of either the Michigan or the United States Constitution.

## A. Real Property Questions

### 1. Exemption From Personal Property Taxes

The Water Exemption Act, MCL 323.351 *et seq.;* MSA 7.793(51) *et seq.,* provides for the issuance of certificates by the State Tax Commission which exempt water pollution control facilities from certain taxes. Specifically, § 4 of that act provided, in part, at the time Consumers applied for exemption:

"For the period subsequent to the effective date of the certificate and continuing so long as the certificate is in force, a facility covered thereby is exempt from *personal* property taxes imposed under Act No. 206 of the Public Acts of 1893, as amended, being sections 211.1 to 211.157 of the Compiled Laws of 1948." MCL 323.354; MSA 7.793(54). (Emphasis supplied.)

By 1977 PA 282, this section of the act was amended to provide that "a facility covered thereby is exempt from *real and personal* property taxes * * *". (Emphasis supplied.)

When Consumers Power applied for tax exemption certificates under the Water Exemption Act for the Palisades liquid radwaste system and cooling towers, the State Tax Commission granted the exemptions. In its official order of July 9, 1975, affirming the grants of these exemptions, the commission addressed the question of the real property nature of these facilities and held that read-

ing the act as a whole and requiring that these facilities meet the other criteria of the act results in these facilities qualifying for the statutory tax exemption.

In reaching this decision the commission adopted the rationale proffered by Consumers Power that a reading of the act as a whole, and specifically the statutory definitions of "facility", "treatment works", and "disposal system", MCL 323.351; MSA 7.793(51), compel the conclusion that the Legislature intended to redefine the term "personal property" for exemption purposes to include within that term various types of immovable plant equipment coming within these definitions and normally used for water pollution control purposes, even though they might be regarded as real property for other purposes. Any other interpretation, according to the commission, would defeat the purpose of the act and would mean the Legislature wrote a useless law. The circuit court agreed, but the Court of Appeals reversed.

Consumers Power elaborates on this same rationale before this Court. We find its reasoning unpersuasive particularly in light of one very specific amendment to this act while it was in bill form, being considered for enactment into law by our state Legislature.

As originally introduced on January 19, 1966, House Bill No. 3075 (subsequently enacted as the Water Exemption Act), provided in part in § 4, beginning on page 3, line 21:

"(1) For the period subsequent to the effective date of the certificate and continuing so long as the certificate is in force, a facility covered thereby is exempt from *real and personal* property taxes imposed under Act No. 206 of the Public Acts of 1893, as amended, being

sections 211.1 to 211.157 of the Compiled Laws of 1948."[8] (Emphasis supplied.)

This bill was first referred to the Committee on Conservation and Recreation, 1 Michigan House J (1966) 63, which reported it back with recommended amendments. 1 Michigan House J (1966) 650. The amendments were adopted and the bill was referred to the Committee on General Taxation, 1 Michigan House J (1966) 703. The Committee on General Taxation reported the bill back to the full House with recommended amendments, including the specific recommendation to: "4. Amend page 3, line 24, by striking out 'real and.'" 2 Michigan House J (1966) 1468. These amendments were adopted by the full House and the bill was passed. 3 Michigan House J (1966) 2196.

After adopting an additional amendment to the bill as passed by the House, which did not affect § 4(1), the Senate passed the bill. 2 Michigan Senate J (1966) 1947.

---

[8] The following definitions were found in § 1 of House Bill 3075, as introduced:

"Sec. 1. As used in this act:

"(a) 'Facility' means any disposal system, including disposal wells, or any treatment works, pretreatment works, appliance, equipment, machinery or installation constructed, used or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial waste including the real property upon which any of the preceding is located.

"(b) 'Industrial waste' means any liquid, gaseous or solid waste substance resulting from any process of industry, manufacture, trade or business, or from the development, processing or recovery of any natural resource which is capable of polluting the waters of the state.

"(c) 'Treatment works' means any plant, disposal field, lagoon, dam, pumping station, incinerator or other works or reservoir used for the purpose of treating, stabilizing, isolating or holding industrial waste.

"(d) 'Disposal system' means system for disposing of or isolating industrial waste and includes pipelines or conduits, pumping stations and force mains, and all other constructions, devices, appurtenances and facilities used for collecting or conducting water borne industrial waste to a point of disposal, treatment or isolation."

The House concurred in the Senate amendment and the bill was sent to the Governor for signature. 4 Michigan House J (1966) 3244. On June 11, 1966, it was approved by the Governor and given immediate effect as 1966 PA 222.

We find that tracing this legislative history makes clear that the intent of the Legislature in enacting this law was to provide exemption to qualifying water pollution facilities from personal property taxes only. We have no supporting documentation in the legislative history to provide an insight into the reason for striking the reference to exemption from real property taxes.

Mere conjecture suggests that there may have been strong opposition to the bill as originally drafted by local units of government who could foresee the exemption of large water pollution control facilities from real property taxes as an erosion of their property tax base. Or the Legislature might simply have decided to proceed cautiously in granting these exemptions to determine whether granting exemptions from personal property taxes alone would provide adequate incentive for the acquisition and operation of socially desirable water pollution control facilities.

But whatever the unpreserved legislative intent was in 1966, we can only conclude that the Legislature as a whole, and particularly the members of the House Committee on General Taxation, adopted this amendment to the bill as introduced deliberately and with a purpose. While the act's definitions of facilities, treatment works and disposal systems which may qualify for exemption appear to include many facilities that might normally be classified as real property, we do not read these definitions as an indication that the Legislature redefined personal property for purposes of

the act. We do not think the brief legislative history of this bill warrants such a conclusion.

We also disagree with Consumers Power's contention that the amendment to § 4 made by 1977 PA 282, to provide for exemption for water pollution facilities from real and personal property taxes was simply intended to clarify the purposes of the act.

We hold that, prior to the effective date of 1977 PA 282,[9] qualifying water pollution control facilities were eligible for exemption from personal property taxes only under MCL 323.354(1); MSA 7.793(54)(1), and the Legislature did not redefine the term "personal property" for purposes of tax exemption under the act.

## 2. The Liquid Radwaste System and the Cooling Towers are Real Property

In the first issue on which leave to appeal was granted, we asked the parties in this case to address the question of whether the Palisades plant's liquid radwaste system and cooling towers are real property. In its brief, Consumers Power argued that these facilities are not real property for purpose of exemption under the act because the act contemplated a definition of personal property that included these facilities. We have decided this argument against Consumers.

Next, Consumers contended that if common-law principles or the General Property Tax Act are determined to be material to a definition of real and personal property for purposes of this suit, then this matter should be remanded to the State Tax Commission for the development of a record as to the nature of these facilities.

_____

[9] December 23, 1977.

While we acknowledge that the commission's decision below appeared to render it unnecessary to decide whether these facilities were real or personal property for purpose of eligibility for exemption under the act, we find there is adequate evidence in the record for determining that these facilities are real property. Further, because this Court specifically invited the parties to address this issue, Consumers had the opportunity to refute the evidence we find in the record to support this conclusion, yet failed to do so.

The most compelling evidence we find in the record to support the conclusion that these facilities are real property is found in Consumers Power's admitted failure to report any portion of these facilities on its personal property tax statements for 1974 and 1975. The personal property statement which Consumers properly filed, pursuant to MCL 211.18; MSA 7.18, specifically requests the reporting of the following information on page 2:

"3. AIR POLLUTION CONTROL FACILITIES AND WATER POLLUTION CONTROL FACILITIES certified exempt by the Michigan State Tax Commission. Use cost installed. Attach rider giving certificate number, year of acquisition and cost by year of acquisition."

At the hearing before the commission, counsel for Consumers stipulated that Consumers reported nothing in this provision in either its 1974 or 1975 personal property statement.

In addition to this failure of Consumers to report any part of the water pollution control facilities as exempt personal property, the following unchallenged testimony of the Covert Township assessor (Mr. Sarno) supports the conclusion that these facilities are real property.

"*Q.* Mr. Sarno, in 1973, did Consumers Power Company furnish you the estimated cost of the partial construction of the liquid radwaste system and cooling towers?

"*A.* They did.

"*Q.* What was the amount furnished you by Consumers Power?

"*A.* $10,880,258.

"*Q.* Was that represented to you to be real property?

"*A.* It was included in the real [property] report.

"*Q.* Furnished to you by Consumers Power?

"*A.* That is correct.

\*   \*   \*

"*Q.* Did you place the partially constructed facility on the real property roll for the year 1973?

"*A.* I did as work in progress.

"*Q.* Approximately what amount?

"*A.* On the assessed valuation approximately $1,250,-000.

"*Q.* Did Consumers Power Company appear at the Board of Review?

"*A.* Yes.

"*Q.* Were they aware of the fact it was on the real property roll?

"*A.* I would assume they were.

"*Q.* Did Consumers Power Company furnish you with a personal property statement for the year 1973?

"*A.* Yes.

"*Q.* Either the cooling tower, a portion of it or radwaste system, any portion of it included in the personal property statement?

"*A.* It was not.

"*Q.* In 1974 did Consumers Power Company furnish you a statement of the value of the completed and partially completed cooling towers and radwaste system?

"*A.* Yes.

\*   \*   \*

"*Q.* Was that furnished in the statement form?

"*A.* Yes.

"*Q.* Represented to you to be real property?
"*A.* Yes, sir.

\* \* \*

"*Q.* Did Consumers Power furnish you a personal property statement for the year 1974?
"*A.* Yes.
"*Q.* Did that statement include all or any portion of the cooling towers, all or any portion of the liquid radwaste system?
"*A.* It did not.
"*Q.* Did Consumers Power Company furnish you a personal property statement for 1975?
"*A.* Yes.
"*Mr. Tracy:* Mr. Chairman, didn't we go through all of this yesterday?
"*Chairman Purnell:* I think we did this yesterday.
"*Mr. Reed:* As I look through the record at one point it became colloquy, four-way colloquy.
"*Chairman Purnell:* This colloquy was going along. I realize what went on yesterday. What we finally ended up saying is that you agreed that you would refer to that report and introduce a blank personal property statement, you both stipulated that it was not reported on the personal property statement."

Any argument that part or all of the Palisades plant's liquid radwaste system or cooling towers should not properly be classified as real property for the purpose of this suit is foreclosed by Consumers' failure to challenge this record evidence. We conclude that these facilities are real property and were not eligible for tax exemption under the Water Exemption Act prior to the 1977 amendment.

## B. Equal Protection Question

One question remains for resolution. Having construed the Water Exemption Act to exempt

water pollution control facilities from personal property taxes but not from real property taxes (prior to the 1977 amendment), we must determine whether the statute, as so construed, violates the Equal Protection Clauses of the Michigan and United States Constitutions. Const 1963, art 1, § 2; US Const, Am XIV. We find no violation of either clause.

Consumers' contention that the construction we have given this statute violates equal protection guarantees is bottomed on the argument that distinguishing between classifications of property bears no reasonable relationship to the purposes of the act when property in both classifications achieves the object of the legislation, *i.e.,* to prohibit pollution of the state's waters. We do not agree.

The cases which have resolved challenges to state legislative classifications under the Equal Protection Clause of the United States Constitution are legion.

In several cases, particularly pertinent to the challenge brought today, the United States Supreme Court has upheld the classification of property for taxation, and exemption from taxation, by state legislatures.

In *Citizens' Telephone Co of Grand Rapids v Fuller,* 229 US 322; 33 S Ct 833; 57 L Ed 1206 (1913), the Court upheld a Michigan statute which provided a property tax exemption to telephone and telegraph companies whose receipts in Michigan did not exceed $500 per year. The statute was challenged as a violation of the Equal Protection Clause. In reaching its decision the Court said:

"The power of exemption would seem to imply the power of discrimination, and in taxation, as in other

matters of legislation, classification is within the competency of the legislature." 229 US at 329.

And, after citing numerous cases in which that Court had upheld state tax statutes which had variously classified the objects of taxation, the Court went on to say:

"[These cases] illustrate the power of the legislature of the State over the subjects of taxation, and the range of discrimination which may be exercised in classifying those subjects when not obviously exercised in a spirit of prejudice or favoritism. * * * Granting the power of classification, we must grant Government the right to select the differences upon which the classification shall be based, and they need not be great or conspicuous. *Keeney v New York,* 222 US 525, 536 [32 S Ct 105; 56 L Ed 299 (1912)]. The State is not bound by any rigid equality. This is the rule;—its limitation is that it must not be exercised in 'clear and hostile discriminations between particular persons and classes.' See *[Quong Wing v Kirkendall],* 223 US 59, 62, 63 [32 S Ct 192; 56 L Ed 350-352 (1912)]. Thus defined and thus limited, it is a vital principle, giving to the Government freedom to meet its exigencies, not binding its actions by rigid formulas but apportioning its burdens, and permitting it to make those 'discriminations which the best interests of society require.' " 229 US at 331.

We find no prohibited spirit of prejudice or favoritism here. Indeed, as we noted in our discussion, *supra,* the Legislature may reasonably have decided that exempting water pollution control facilities from personal property taxes but not real property taxes would accomplish the act's purpose of encouraging investments in those facilities which the Legislature deemed to be in the public interest.

Further support for our conclusion can be found in *Nashville, C & SL R Co v Browning,* 310 US

362, 368-369; 60 S Ct 968; 84 L Ed 1254 (1940), where in the context of an equal protection challenge to a property tax assessed against a railroad, the United States Supreme Court said:

"That the *states may classify property for taxation;* may set up different modes of assessment, valuation and collection, may tax some kinds of property at higher rates than others; and in making all these differentiations may treat railroads and other utilities with that separateness which their distinctive characteristics and functions in society make appropriate— these are among the commonplaces of taxation and of constitutional law. [Cases cited.] Since, so far as the Federal Constitution is concerned, a state can put railroad property into one pigeonhole and other property into another, the only question relevant for us is whether the state has done so. If the discrimination of which the Railway complains had been formally written into the statutes of Tennessee, challenge to its constitutionality would be frivolous." (Emphasis supplied.)

And finally, in an early case challenging a personal property tax levied against cattle grazing on tax exempt land, the United States Supreme Court said, without specifically citing the Equal Protection Clause:

"[I]t is the usual course in tax laws to treat personal property as one class and real estate as another, and it has never been supposed that such classification created an illegal discrimination, because there might be some persons who owned only personal property, and others who owned property of both classes." *Thomas v Gay,* 169 US 264, 281; 18 S Ct 340; 42 L Ed 740 (1898).

Viewing the challenged classification before us in light of this authority, we find no violation of the United States constitutional guarantee of equal protection.

Similarly, we find no violation of our state constitutional guarantee of equal protection. Consumers Power does not contend that a more stringent equal protection test than that required under the United States Constitution should be applied under our state constitution, in the instant case, nor do we perceive any reason for applying a more stringent test. Furthermore, in the face of an equal protection challenge under the United States Constitution, this Court has recognized that tax statutes may discriminate among classifications of properties, businesses, trades, callings or occupations so long as the discrimination is not arbitrary but is based upon a reasonable distinction or if any state of facts can reasonably be conceived to sustain it. *W S Butterfield Theatres, Inc v Dep't of Revenue,* 353 Mich 345, 353; 91 NW2d 269 (1958). We have found such reasonableness in the classification made by the Legislature here.

We have also held that a legislative classification will be upheld in the face of an equal protection challenge under our state constitution if it rationally furthers the object of the legislation and involves neither a suspect class nor fundamental rights. *In re Kasuba Estate,* 401 Mich 560, 569; 258 NW2d 731 (1977). We find that the instant classification involves no suspect class or fundamental right and rationally furthers the object of the legislation.

III. CONCLUSION

The judgment of the Court of Appeals is affirmed.

No costs.

COLEMAN, C.J., and KAVANAGH, WILLIAMS,

Levin, and Fitzgerald, JJ., concurred with Ryan, J.

Blair Moody, Jr., J. *(concurring in part, dissenting in part).* I concur with the analysis and result that the Consumers Power Palisades Plant water pollution control facilities are real property and, therefore, are ineligible for tax exemption under the Water Exemption Act, MCL 323.351 *et seq.;* MSA 7.793(51) *et seq.* I dissent from the analysis and result that the facilities of the Palisades Plant constitute air pollution control facilities covered by the Legislature in the Air Pollution Act, MCL 336.11 *et seq.;* MSA 14.58(1) *et seq.* Because the Legislature did not clearly intend to include facilities such as those employed by the Palisades Plant within the ambit of the Air Pollution Act, the Palisades Plant does not qualify for a tax exemption under the Air Exemption Act, MCL 336.1 *et seq.;* MSA 7.793(1) *et seq.*

## INTRODUCTION

Since this matter involves principles of statutory construction, it is initially necessary to set forth certain relevant statutory provisions in question and the legal standards that are applicable in construing such provisions.

Section 2 of the Air Pollution Act defines the term "air pollution" as follows:

" 'Air pollution' means the presence in the outdoor atmosphere of air contaminants in quantities, of characteristics and under conditions and circumstances and of a duration which are or can become injurious to human health or welfare, to animal life, to plant life or to property, or which interferes with the enjoyment of life and property in this state and excludes all aspects

of employer-employee relationships as to health and safety hazards." MCL 336.12(c); MSA 14.58(2)(c).

The act creates an Air Pollution Control Commission, within the Department of Public Health, to administer and carry out the provisions of the act.

"Piggy-backed" on the Air Pollution Act is the Air Exemption Act. This act provides for a tax exemption[1] if the following conditions are met:

"If the director of public health finds that the facility is designed and operated primarily for the control, capture and removal of pollutants from the air, and is suitable, reasonably adequate and meets the intent and purposes of the air pollution act, Act No. 348 of the Public Acts of 1965, as amended, being sections 336.11 to 336.36 of the Compiled Laws of 1948, and rules promulgated thereunder, he shall so notify the state tax commission who shall issue a certificate." MCL 336.3; MSA 7.793(3).

For purposes of the act, a "facility" is defined in pertinent part as:

"[M]achinery, equipment, structures, or any part or accessories thereof, installed or acquired for the primary purpose of controlling or disposing of air pollution which if released would render the air harmful or

[1] Section 4 of the Air Exemption Act provides that a facility will be exempt from the following taxes:

"(1) For the period subsequent to the effective date of the certificate and continuing so long as the certificate is in force, a facility covered by the certificate is exempt from real and personal property taxes imposed under Act No. 206 of the Public Acts of 1893, as amended, being sections 211.1 to 211.157 of the Michigan Compiled Laws.

"(2) Tangible personal property purchased and installed as a component part of the facility shall be exempt from:

"(a) Sales taxes imposed under Act No. 167 of the Public Acts of 1933, as amended, being sections 205.51 to 205.78 of the Michigan Compiled Laws.

"(b) Use taxes imposed under Act No. 94 of the Public Acts of 1937, as amended, being sections 205.91 to 205.111 of the Michigan Compiled Laws." MCL 336.4; MSA 7.793(4).

inimical to the public health or to property within this state." MCL 336.1; MSA 7.793(1).

Within this statutory milieu, this Court has long-established certain principles of legal construction which are applicable in cases involving tax exemptions. In a very early case, this Court announced the rule that a tax exemption is not to be assumed in any case unless the statutory language would allow no other construction. *The East Saginaw Mfg Co v East Saginaw,* 19 Mich 259 (1869). Historically, this Court has rigidly adhered to this "strict" construction of tax exemption statutes. More recently, this Court rephrased and reiterated the rule as follows:

" 'An intention on the part of the legislature to grant an exemption from the taxing power of the State will never be implied from language which will admit of any other reasonable construction. Such an intention must be expressed in clear and unmistakable terms, or must appear by necessary implication from the language used, for it is a well-settled principle that, when a specific privilege or exemption is claimed under a statute, charter or act of incorporation, it is to be construed strictly against the property owner and in favor of the public. This principle applies with peculiar force to a claim of exemption from taxation. Exemptions are never presumed, the burden is on a claimant to establish clearly his right to exemption, and an alleged grant of exemption will be strictly construed and cannot be made out by inference or implication but must be beyond reasonable doubt.' " *Detroit v Detroit Commercial College,* 322 Mich 142, 148-149; 33 NW2d 737 (1948).

## DISCUSSION

The issue in this case is clearly drawn, *i.e.,* whether the Palisades Plant nuclear facilities

meet the following three-pronged test to qualify for a tax exemption under the Air Exemption Act: 1) the facility is designed and operated *primarily* for the control, capture and removal of pollutants from the air; 2) the facility is *suitable* and *reasonably adequate* for the control, capture and removal of pollutants from the air; 3) the facility is one which the Legislature *intended* to be covered under the Air Pollution Act.

The discussion which follows will focus on the third element of the three-pronged test. Without conceding that defendant Consumers has met its burden under the first two prongs of the test to qualify for a tax exemption,[2] discussion of that

---

[2] Consumers makes a pointed argument that it meets the first two elements of the three-pronged test. As to the first element, Consumers argues that the containment building which houses the nuclear reactor at the power plant, the building's spray system, the building's cooling system and the plant's gaseous radioactive waste (radwaste) system are all designed and operated "primarily" to prevent the release of effluvia into the air. According to this argument, because of the broad definition of the term "air pollution" in the Air Pollution Act, radiation or radioactive emissions would qualify as air contaminants under the act.

Plaintiff Covert Township, on the other hand, focuses its argument on the statutory term "primarily" as it is used in the Air Exemption Act. Covert argues that the "primarily" language connotes a subjective test, *i.e.,* a party claiming a tax exemption must show that its subjective intent or purpose in installing the alleged air pollution control equipment was to actually control air pollution. Consumers' primary purpose in installing the equipment was to meet the Federal guidelines and regulations of the Atomic Energy Commission (now the Nuclear Regulatory Commission). Since Consumers did not acquire and install the equipment for the primary purpose of controlling air pollution, it fails to meet the first element of the test.

There is some support for the Covert position. In the only prior decision in this jurisdiction construing the language of the Air Exemption Act, the Court of Appeals applied a subjective test. *Meijer, Inc v State Tax Comm,* 66 Mich App 280, 283; 238 NW2d 582 (1975). The *Meijer* Court opined:

"Whether something constitutes a facility within the meaning of the act thus depends on the primary reason for its acquisition and/or installation. The language does not focus on the functional characteristic of the object itself. The initial question is whether appellee acquired and installed the balers and compacters in order to prevent, control or abate air pollution. If so, was that the primary reason?"

As to the second element of the three-pronged test, Consumers

question becomes unnecessary. Because the Legislature in enacting the Air Pollution Act did not clearly and unambiguously express the intention that nuclear power facilities should be covered by the act, defendant Consumers has failed to satisfy the third essential element to qualify for a tax exemption under the Air Exemption Act.

I

A careful examination of the Air Pollution Act demonstrates that the Legislature has given a very broad general definition to the term air pollution. What is or is not air pollution for purposes of the act is unclear. Whether the Legislature intended that radiation or radioactive emissions be included in the category of effluvia that constitute air pollution is not clearly spelled out.

What does become evident from examining the act is that the Legislature left up to the Air Pollution Control Commission the duty of administering the act and setting up rules and regulations for compliance with the act. Section 7 of the act enunciates in mandatory terms the rule-making duties of the Air Pollution Control Commission:

"(2) The commission *shall* promulgate rules in accordance with and subject to Act No. 306 of the Public

argues and presented evidence before the Director of Public Health and the State Tax Commission that the facility is suitable and reasonably adequate for controlling air pollution. It is difficult to argue against this position, because there is no independent basis for review of the information which Consumers provided. Under the strict construction to be applied in tax exemption actions, it may be highly questionable whether Consumers has met its burden because there is no verification other than what may be viewed as Consumers' self-serving statements that the facility adequately controls air pollution.

Acts of 1969, as amended, being sections 24.201 to 24.315 of the Compiled Laws of 1948 for purposes of:

"(a) Controlling or prohibiting air pollution.

"(b) Complying with the federal clean air act, being 42 U.S.C., section 1857 et sequence [sic], as amended.

"(c) Controlling any mode of transportation which is capable of causing or contributing to air pollution.

"(d) Reviewing proposed locations of stationary emission sources.

"(e) Reviewing modifications of existing emission sources.

"(f) Prohibiting locations or modifications of emission sources which impair the state's ability to meet federal ambient air standards.

"(g) Establishing suitable emission standards consistent with ambient air quality standards established by the federal government and factors, including but not limited to, conditions of the terrain, wind velocities and directions, land usage of the region and the anticipated characteristics and quantities of potential air pollution sources. This act does not prohibit the commission from denying or revoking a permit to operate a control facility that would adversely affect human health or other conditions important to the life of the community." (Emphasis added.) MCL 336.17(2); MSA 14.58(7)(2).

The Air Pollution Control Commission has complied with its statutory mandate. The commission has established extensive regulations regarding emission standards, air quality standards, fuel burning equipment and air cleaning devices. The commission has also established procedures for the collection of surveillance fees[3] and for the filing of

---

[3] Section 14a of the act requires the commission to levy annual surveillance fees and reads in pertinent part as follows:

"(1) Notwithstanding any other provision of this act, in order to provide for increased surveillance, investigation and other activities necessary to provide greater protection of air of this state and for attainment and maintenance of national ambient air quality standards, the commission shall levy an annual surveillance fee based on the commission's estimate of the surveillance cost to the commission

annual reports by commercial, industrial or governmental sources of emission of air contaminants.[4] In addition, the commission has compiled a "register of materials", which consists of chemical or particulate contaminants which if found in sufficient quantities in the ambient air can endanger the health and safety of the populace. The register includes the following:

"Group W
  Asbestos
  Benzo-a-pyrene
  Beryllium or its compounds
  Bromine
  Chlorine
  Cyanides
  Fluorides
  Fluorine
  Iodine
  Lead or its compounds
  Mercaptans
  Mercury or its compounds
  Pesticides
  Sulfides, organic or inorganic

"Group X
  Particulate (except those listed in Group W)

"Group Y
  Sulfur dioxide

"Group Z
  Oxides of Nitrogen
  Carbon monoxide
  Ammonia
  Alcohols

---

or a local agency as provided for in subsection (2) for each manufacturing or commercial location." MCL 336.24a; MSA 14.58(14a).

[4] 1975 AACS R 336.81, p 7926.

Ethers
Esthers *[sic]*
Ketones
Halogenated hydrocarbons
Non-methane hydrocarbons".
1975 AACS, table 5, p 7927.

What is significant both about the regulations and the register of materials is not so much what they include but what they do not include. Nowhere in the regulations is there any mention of nuclear power plants or nuclear power facilities. Correlatively, nowhere in the register of materials is there any mention of radiation or of alpha particles, beta particles or gamma rays, which constitute the emissions that may be released by a nuclear facility. It would stretch the bounds of logic to assume that the Legislature or the Air Pollution Control Commission by their silence intended to cover these facilities or materials under the Air Pollution Act.

It is contended by Consumers that the only reason for the silence or inaction on the part of the Legislature or Air Pollution Control Commission is that the whole field of regulation regarding radioactive materials and radiation hazards has been preempted by the Federal government. It is pointed out that as early as 1962, prior to the enactment of the Air Pollution Act in 1965, the Michigan Attorney General issued an opinion stating that the Federal government had preempted the field of regulation of radiation hazards. OAG, 1961-1962, No 4073, p 565 (October 31, 1962). Further, the Federal preemption of radiation and radiation hazards was judicially recognized in *Northern States Power Co v Minnesota,* 447 F2d 1143 (CA 8, 1971), *aff'd without opinion,* 405 US 1035 (1972).

Initially this contention could be answered with the assertion that since the Legislature may have been convinced of Federal preemption, it certainly had no intention to cover nuclear facilities by a vehicle such as the Air Pollution Act. However, Consumers' contention must also fail for two other pertinent reasons.

First of all, even a cursory examination of the overall legislative schema that constitutes the Air Pollution Act vividly demonstrates that the Legislature intended to regulate in the field of air pollution. The whole act is regulatory in nature.

Without citing every provision of the act which is basically regulatory, it is important to note that the Legislature delegated important regulatory powers and authority to the Air Pollution Control Commission and also provided sanctions for violations of the act. Section 5 of the act enumerates many of the regulatory functions to be carried out by the commission and reads in part:

"The commission may:

"(a) Establish standards for ambient air quality and for emissions.

"(b) Issue permits for the construction and the operation of air pollution control facilities and source emissions and to require reports of the operation of the air pollution control facilities.

"(c) Compel the attendance of witnesses at proceedings of the commission upon reasonable notice.

"(d) Make findings of fact and determinations.

"(e) Make, modify or cancel orders which require, in accordance with the provisions of this act, the control of air pollution.

"(f) Institute in a court of competent jurisdiction proceedings to compel compliance with the provisions of any rule or any determination or order which it may promulgate or issue under this act.

"(g) Do such other things as it may deem necessary, proper or desirable in order that it may enforce rules promulgated under this act.

"(h) Accept, or when deemed necessary by the commission require to be submitted to it, and consider for approval plans for air cleaning devices or any part thereof and inspect the installation for compliance with the plans.

"(i) Enter and inspect any property at reasonable times and places pursuant to reasonable notice for the purpose of investigating either an actual or suspected source of air pollution or ascertaining compliance or noncompliance with any rule which it may promulgate under this act. If in connection with such investigation or inspection, samples of air contaminants are taken for analysis, a duplicate of the analytical report shall be furnished promptly to the person who is suspected of causing such air pollution." MCL 336.15; MSA 14.58(5).

Legislative sanctions are found in § 16:

"A person who or a governmental unit who fails to obtain or comply with a permit, or comply with a final order or order of determination of the commission made under this act is guilty of a misdemeanor and shall be fined not more than $10,000.00 and in the discretion of the court an additional amount of not more than $2,000.00 per day a violation continues." MCL 336.26; MSA 14.58(16).

It is difficult to conceive that the Legislature would establish such an extensive regulatory structure and then reward with a tax exemption a facility which has no obligation to comply with the regulations of the act.

Second, it is very misleading to say that the Legislature is completely preempted from regulating in the field of nuclear power or radiation

control.[5] It is true that in *Northern States* the court held that the Federal government has exclusive authority under the doctrine of preemption to regulate the construction and operation of nuclear power plants and this authority includes regulation of the levels of radioactive effluents discharged from the plant and precludes such regulation by·the states.[6] *Northern States,* 1154. However, the court also made clear that the states are not totally precluded and can regulate for purposes other than protection from radiation hazards. *Northern States,* 1150.

The Court of Appeals in this jurisdiction in *Marshall v Consumers Power Co,* 65 Mich App 237; 237 NW2d 266 (1975), reached a similar conclusion. While recognizing Federal preemption, the *Marshall* Court noted that the state could regulate nonradiological hazards through its police power. The Court even suggested avenues by which the state could exercise its police powers over the nuclear power industry, *e.g.,* local building codes, non-discriminatory zoning requirements, and abatement of common-law nuisances. *Marshall,* 251.

---

[5] For an extensive discussion of permissible state authority in the field of nuclear power regulation, see Murphy & La Pièrre, *Nuclear "Moratorium" Legislation in the States and the Supremacy Clause: A Case of Express Preemption,* 76 Columbia L Rev 392 (1976); Bischoff, Note, *Nuclear Power Regulation: Defining the Scope of State Authority,* 18 Ariz L Rev 987 (1976).

[6] In reaching its decision that the Federal government had preempted the field of regulation of radiation hazards, the *Northern States* court relied on two primary considerations. The first is the following statutory provision from the Atomic Energy Act:

"Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes *other than protection against radiation hazards.*" (Emphasis added.) 42 USC 2021(k).

Second, the court found the entire legislative history of the Atomic Energy Act compelled the conclusion that the Federal government intended to occupy the field exclusively.

Several states, following the lead of the *Northern States* and *Marshall* decisions, have taken dramatic steps to regulate the nuclear power industry and even radiation hazards. The California Supreme Court in *Northern California Ass'n to Preserve Bodega Head & Harbor, Inc v Public Utilities Comm,* 61 Cal 2d 126; 390 P2d 200; 37 Cal Rptr 432 (1964), held that the states were not precluded by the doctrine of Federal preemption from questioning the safety of the location of atomic reactors.

The Vermont and Wisconsin Public Service Commission have taken even bolder steps. The Vermont agency was able to secure an agreement from a nuclear power company in which the company agreed to submit to the rules and regulations of the agency regarding radioactive emissions. *Re Vermont Yankee Nuclear Power Co,* 91 PUR3d 1 (Vermont Public Service Board, 1971). And in Wisconsin, the Public Service Commission has ruled that it has the authority in a certification proceeding to inquire into the design, safety and reliability of nuclear power plants. *In re Wisconsin Electric Power Co,* 5 CCH Atomic Energy L Reporter ¶ 16,631 (May 1, 1975). On two occasions the Wisconsin Commission has actually imposed safety design conditions on the construction of nuclear reactors. *Joint Application of Wisconsin Public Service Corp,* 52 Wis Pub Serv Comm 461 (1967); *Application of Wisconsin Electric Power Co,* 52 Wis Pub Serv Comm 501 (1967).

Further, the whole issue of Federal preemption may be moot in light of recent amendments to the Federal Clean Air Act. 42 USC 7401 *et seq.* The 1977 amendments delegate to the Environmental Protection Agency authority over the control of radioactive pollutants:

"Not later than one year after August 7, 1977 (two years for radioactive pollutants) and after notice and opportunity for public hearing, the Administrator shall review all available relevant information and determine whether or not emissions of radioactive pollutants (including source material, special nuclear material, and byproduct material), cadmium, arsenic and polycyclic organic matter into the ambient air will cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health. If the Administrator makes an affirmative determination with respect to any such substance, he shall simultaneously with such determination include such substance in the list published under section 7408(a)(1) or 7412(b)(1)(A) of this title (in the case of a substance which, in the judgment of the Administrator, causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness), or shall include each category of stationary sources emitting such substance in significant amounts in the list published under section 7411(b)(1)(A) of this title, or take any combination of such actions." 42 USC 7422(a).

The amendments also delegate to the states the authority to regulate any air pollutants as defined under the Clean Air Act. 42 USC 7416.[7] It seems

---

[7] It is clear from the Conference Report on the 1977 Clean Air Act Amendments that Congress wished to delegate control of radioactive pollutants to the Environmental Protection Agency and to the states:

"The conference agreement adopts the House provision which classifies radioactive substances (including, but not limited to, naturally occurring radioactive materials, accelerator produced isotopes, and source material, special nuclear material, and byproduct material as defined by the Atomic Energy Act, as amended) as air pollutants. This brings them under the various provisions of the Clean Air Act and allows their regulation as criteria pollutants under ambient air quality standards, as hazardous air pollutants, or under new source performance standards, as appropriate. In the past there has been doubt about the authority for regulation of radioactive air pollutants under the Clean Air Act. This provision makes it clear that the full regulatory framework of the act is available for radioactive pollutants.

\* \* \*

that with these two provisions the state is clearly
not precluded from regulating radioactive emis-
sions.[8]

Despite all this implied authority granted the
state by the *Northern States* and *Marshall* deci-
sions, the actions of other states, and the direct
grant of authority under the Clean Air Act, the
Legislature and the Air Pollution Control Commis-
sion have taken absolutely no action to regulate
radiation and nuclear power plants under the Air

"Under this provision, radioactive pollutants, including source ma-
terial, special nuclear material and byproduct material are covered by
Section 116 of the Clean Air Act. Thus, any State, or political
subdivision thereof, may establish standards more stringent than
Federal, or where a Federal standards *[sic]* has not been established,
may establish any standards they deem appropriate. Thus the provi-
sion would not preempt States and localities from setting and enforc-
ing stricter air pollution standards for radiation than the Federal
standards, and would not follow the holding of *Northern States Power
Co v Minnesota,* 447 F2d 1143 (CA 8, 1971), *aff'd* 405 US 1035 (1972),
in the context of radioactive air pollution." HR Rep No. 564, 95th
Cong, 1st Sess (1977), pp 142-143.

This quotation is not only enlightening regarding Congress' position
on the Federal preemption issue but it is also revealing regarding
Congress' and the various Federal agencies' confusion over whether
radiation or radioactive emissions should be classified as air pollu-
tants. If the Federal agencies who had complete control over the field
were unsure of their position on radiation, it is hardly any wonder
that the Michigan Legislature or the Air Pollution Control Commis-
sion could know how to handle the issue of radiation hazards. This
quotation further buttresses the position that the Air Pollution Con-
trol Commission's actions in not including radiation in its register of
materials was a conscious act, as that commission did not view
radiation as an air pollutant under the Michigan act.

[8] A caveat is in order at this point. While the Clean Air Act appears
to give jurisdiction to the Environmental Protection Agency and the
states over radioactive substances and emissions, the extent of any
authority is unknown. In enacting the Clean Air Act amendments,
Congress did not choose to repeal the following subsection of the
Atomic Energy Act, which subsection formed the basis for the *North-
ern States* court's decision that the Federal government had
preempted the field of regulation of radioactive emissions:

"Nothing in this section shall be construed to affect the authority of
any State or local agency to regulate activities for purposes other
than protection against radiation hazards." 42 USC 2021(k).

If this subsection remains viable, as it appears to, the Nuclear
Regulatory Commission could still assert total jurisdiction over the
area.

Pollution Act. It can hardly be said that Consumers is entitled to a tax exemption under the Air Exemption Act when the Legislature has clearly declined to include Consumers facilities under the regulatory control of the Air Pollution Act. The intent and purposes of the Air Pollution Act do not encompass radiation hazards.

## II

While the impression may have been given from the previous section of this opinion that the Legislature has done absolutely nothing regarding the regulation and control of radioactive emissions, such an impression is not entirely warranted. It is true that the Legislature has chosen not to include radiation under the regulatory umbrella of the Air Pollution Act. However, the Legislature has taken direct, positive steps to regulate radioactive emissions, but it has chosen a vehicle other than the Air Pollution Act.

In 1972 the Legislature enacted the radiation control act, MCL 325.451 *et seq.;* MSA 14.528(301) *et seq.* This act was later repealed and replaced by 1978 PA 368, MCL 333.13501 *et seq.;* MSA 14.15(13501) *et seq.* The new act did not make any substantive changes in the prior enactment, but merely codified the act under the Public Health Code.

The title to the original radiation control act is pertinent to the discussion:

"AN ACT to provide *for control of ionizing radiation emissions; to provide for certain contractual agreements with the federal government for the licensing of radioactive materials; to designate the department of public health as the state radiation control agency; to establish a radiation advisory committee;* to adopt rules

implementing this act; and to prescribe penalties for violations." (Emphasis added.) 1972 PA 305.

It is clear from the very title of this act that this is the instrument the Legislature intended to use for the regulation and control of radioactive emissions. In addition, the Legislature set up a separate bureaucratic structure for the regulation of radioactive emissions with the department of public health designated as the state radiation control agency and with a radiation advisory committee.

It is also of critical importance to note what the Legislature sought to control among other things in enacting the legislation. Section 13506 of the 1978 act, formerly § 11, provides in pertinent part:

"Sections 13505 and 13515 to 13536 do not apply to the following sources or conditions, except as noted:

* * *

"(e) A production or utilization facility, as defined in the federal atomic energy act of 1954, 42 U.S.C. 2011 to 2281, or a source of ionizing radiation used in or in connection with the operation of a production or utilization facility pursuant to a license from the federal nuclear regulatory commission or successor thereto. *However, the department may collect radiation data and perform environmental monitoring in connection with the operation of the facility in accordance with this part.*

"(f) A source material, by-product material, or special nuclear material over which the federal nuclear regulatory commission or a successor thereto has exclusive regulatory jurisdiction under the federal atomic energy act of 1954, which jurisdiction has not been transferred to this state pursuant to an agreement under Act No. 54 of the Public Acts of 1965, being sections 3.801 and 3.802 of the Michigan Compiled Laws." (Emphasis added.) MCL 333.13506(e), (f); MSA 14.15(13506)(e), (f).

Subsections (e) and (f) of § 13506 demonstrate an

awareness on the part of the Legislature that the
Federal government has preempted certain areas
of the radiation regulatory field. But more impor-
tantly the subsections show that the Legislature
provided a means, under the radiation control act,
for the state to assume control over radioactive
emissions should the Federal government cede
such power to the state. And, finally, the Legisla-
ture took an active step in the field of radioactive
emissions by providing for the collection of radia-
tion data and the monitoring of utilization facili-
ties. The Air Pollution Act is not involved.

There can be no doubt from a reading of the
radiation control act that the Legislature intended
this act, not the Air Pollution Act, to be the vehicle
for the regulation of radioactive emissions in this
state. Significantly, this act, unlike the Air Exemp-
tion Act, provides no tax exemption for compliance
with the act. Nor is there mention made in the Air
Exemption Act that a tax exemption will be given
for compliance with the intent and purposes of the
radiation control act.

## III

Even if it could be said that the Air Pollution
Act were applicable to nuclear power plant facili-
ties, the very nature of the facilities present seri-
ous proof problems in determining whether the
facilities qualify for a tax exemption. This is par-
ticularly true in light of the strict construction
rule that is applicable in the tax exemption con-
text. The chief problem is this: since nuclear facili-
ties are not subject to the regulatory mechanics of
the Air Pollution Act, how can the Director of
Public Health or the State Tax Commission make
an informed decision on whether the facilities are

designed and operated primarily for the control, capture and removal of pollutants from the air; whether the facilities are suitable and reasonably adequate; and whether the facility is one which the Legislature intended to be covered under the Air Pollution Act?

The simplistic answer is that the Director of Public Health and the State Tax Commission must rely primarily on the statements and evidence presented by the party requesting the tax exemption. There are some inherent problems with this solution. The evidence supplied by the requesting party may be viewed as self-serving. Without any independent method of verification of the evidence, there is no reasonable basis upon which the Director of Public Health can make an objective and informed decision concerning whether the facilities adequately prevent the release of radioactive emissions into the air. Further, although it is not suggested that such is the case here, it has been alleged by one commentator that some utility companies are less than candid in supplying information regarding their nuclear facilities.[9]

It could be contended that the evidence supplied by a utility company must be fundamentally reliable, because, based upon this same evidence, the Nuclear Regulatory Commission (NRC) licensed the nuclear plant and determined that the facilities were environmentally sound and posed no threat to the public health and safety from radioactive emissions. This contention is equally suspicious.

Unlike the Air Pollution Act which has for its primary purpose the prevention of the emission of air pollutants, the Atomic Energy Act, 42 USC

---

[9] See Coggins, *The Environmentalist's View of AEC's "Judicial" Function: A Reply to Messrs Doub Et Al*, 15 Atomic Energy L J 176 (1973).

2011 *et seq.,* from which the NRC derives its powers, has throughout most of its history had a bifurcated purpose: to promote the growth and expansion of the nuclear power industry and to insure that the public health and safety is protected. Such a dual administrative function is susceptible to inherent conflicts.[10] As the decisions of the various Federal courts so dramatically reveal, in balancing the promotion of and the need for nuclear energy against the risk of environmental damage or damage to the public health and safety, the promotion factor almost always wins. *Calvert Cliffs' Coordinating Committee, Inc v Atomic Energy Comm,* 146 US App DC 33; 449 F2d 1109 (1971); *Union of Concerned Scientists v Atomic Energy Comm,* 163 US App DC 64; 499 F2d 1069 (1974); *Porter County Chapter of the Izaak Walton League of America, Inc v Atomic Energy Comm,* 533 F2d 1011 (CA 7, 1976).

As to the reliability of the NRC's environmental evaluations in general, the courts and the commentators have been highly critical. Judge Skelly Wright took the Commission to task in the *Calvert Cliffs* decision, noting the lax environmental standards:

"The one thing the Commission has refused to do is take any independent action based upon the material in the environmental reports and 'detailed statements.' Whatever environmental damage the reports and statements may reveal, the Commission will allow construction to proceed on the original plans. It will not even consider requiring alterations in those plans (beyond compliance with external standards which would be binding in any event), though the 'detailed statements' must contain an analysis of possible alternatives and may suggest relatively inexpensive but highly beneficial

---

[10] See generally Sax, *The (Unhappy) Truth About NEPA,* 26 Okla L Rev 239 (1973); Coggins, *supra.*

changes. Moreover, the Commission has, as a blanket policy, refused to consider the possibility of temporarily halting construction in particular cases pending a full study of a facility's environmental impact. It has also refused to weigh the pros and cons of 'backfitting' for particular facilities (alteration of already constructed portions of the facilities in order to incorporate new technological developments designed to protect the environment). Thus reports and statements will be produced, but nothing will be done with them. Once again, the Commission seems to believe that the mere drafting and filing of papers is enough to satisfy NEPA [National Environmental Protection Act]." *Calvert Cliffs, supra*, 51; 449 F2d 1127.

Further, the commentators have adroitly pointed out that while the NRC continuously insists that the risk of a "nuclear catastrophe" with resultant damage of massive proportions both to the environment and the public is slim, there is no scientific or mathematical support for the NRC's conclusion.[11]

In the midst of this confusing tableau, the decision of the Director of Public Health can only be based on conjecture. Under the strict construction rule for tax exemption statutes, conjecture can hardly form the basis for a decision to grant a tax exemption.

## CONCLUSION

This Court has consistently held throughout its history that a party requesting a statutory tax exemption is subject to a high burden of proof in

[11] See Yellin, *Judicial Review and Nuclear Power: Assessing the Risks of Environmental Catastrophe*, 45 Geo Wash L Rev 969 (1977); Comment, *The Energy Crisis: "Reasonable Assurances" of Safety in the Regulation of Nuclear Power Facilities*, 55 U Detroit J Urban L 371 (1978). But see Palfrey, *Energy and the Environment: The Special Case of Nuclear Power*, 74 Columbia L Rev 1375 (1974).

order to sustain its claim. This Court has said that a tax exemption will never be implied from statutory language which will admit of any other reasonable construction. If inference or implication are of no avail, then Consumers has failed to meet its burden and the tax exemption must be denied.

A review of the language of the Air Pollution Act shows no intent on the part of the Legislature to regulate the source of radioactive emissions. The act and the actions of the Air Pollution Control Commission are totally silent on the subject of radioactive emissions. Any implication from the broad, general language of the act that radioactive emissions were intended to be covered by the act is wholly unsupported and would be an insufficient basis upon which to suggest a tax exemption claim.

The Legislature has clearly and unambiguously indicated its intent to regulate sources of radioactive emissions, but this indication is found not in the Air Pollution Act but in the radiation control act. There is no clearer statement of legislative intent.

When dealing with crucial public policy considerations involving incentive tax exemptions, ostensibly to encourage construction and safe operation of nuclear plants in Michigan, the legislative pen must write with precision.

For all these reasons, it is held that Consumers has failed to meet its burden of proof for entitlement to a tax exemption. The exemption should be denied.