WEAVER, J.
(concurring in part and dissenting in part). I concur with the lead opinion’s holding that Detroit Diesel’s Equinox Line does not qualify for tax exemptions under part 59 of the Natural Resources and *243 Environmental Protection Act (NREPA)[1] because the Equinox Line was not installed for the primary purpose of controlling or disposing of air pollution, but was instead installed for the primary purpose of producing a new type of vehicle engine for sale. However, I dissent from the lead opinion’s holding that petitioners’ test-cell facilities do not qualify for tax exemption under part 59. I would affirm the Court of Appeals and hold that petitioners’ test-cell facilities qualify for tax exemptions under part 59 because they meet the definition of “facility” in MCL 324.5901 and, under MCL 324.5903, are “designed and operated primarily for the control, capture, and removal of pollutants from the air,” are “suitable” or “reasonably adequate” at abating air pollution, and “meet the intent and purposes of part 55” of NREPA, MCL 324.5501 et seq., which regulates air pollution.
I. FACTS AND PROCEEDINGS
The material facts in these seven consolidated cases are undisputed. Petitioners, Ford Motor Company, DaimlerChrysler, and Detroit Diesel, manufacture motor vehicles and engines. Petitioners’ vehicles and engines are subject to federal air-quality regulations promulgated by the Environmental Protection Agency (EPA).[2] The vehicles and engines must pass EPA-mandated emissions tests before the vehicles and engines can be mass-produced and sold to consumers. Each of the petitioners established “test cell” facilities designed to test vehicle and engine emissions to ensure compliance with EPA regulations. In the test cells, vehicles and engines are placed in a closed room or a bay with a hose attached to the exhaust pipe. While the *244 vehicle or engine is emitting exhaust, samples of the exhaust are sent through devices that measure the emissions and determine whether those emissions comply with federal regulations. The test cells then release the tested emissions into the air.
In addition to a test-cell facility, Detroit Diesel built its Equinox Line facility after its existing Series 60 diesel engine failed to meet the newly enacted EPA emission standards. The Equinox Line facility was designed to manufacture new diesel engines that meet the newest federal pollution-control standards. In October 2002, after Detroit Diesel made significant design changes to the original Series 60 engine, Detroit Diesel’s new Equinox Line of diesel engines obtained EPA certification.
In 2001, Ford Motor Company filed for tax exemptions for test cells and equipment under part 59 of NREPA,[3] which permits tax exemptions for certain facilities that reduce air pollution. This application was granted by the State Tax Commission (STC) after review and approval by the Michigan Department of Environmental Quality (DEQ). In 2003 and 2004, Ford, DaimlerChrysler, and Detroit Diesel filed for multiple exemptions under part 59 for similar test-cell facilities located around the state. Additionally, in 2003 Detroit Diesel applied for tax exemptions for its Equinox Line facility. The STC referred the exemption requests to the DEQ, which concluded that the test-cell facilities and the Equinox Line facility did not meet the requirements for a part 59 tax exemption.
The DEQ concluded that the primary purpose of the test cells was to enable petitioners to sell their vehicles by complying with federal law, not to reduce pollution. *245 The DEQ explained that the test cells did not qualify for the exemption because they did not physically remove or control pollution, but rather actually created pollution during the testing process. In regard to Detroit Diesel’s Equinox Line, the DEQ determined that it was not a qualifying facility under part 59 because its primary purpose was “to manufacture diesel engines for sale by Detroit Diesel.” The DEQ determined that because the air emissions from the Equinox Line manufacturing facility were not significantly different from those emitted by the Series 60 facility, the Equinox Line did not qualify as a “process change” under part 59 that met the goal of reducing pollution. As a result, the STC rejected the tax exemption requests for the test-cell facilities and the Equinox Line facility.
In separate lawsuits, petitioners appealed to various circuit courts. In Ford’s suits, the Wayne Circuit Court reversed the STC’s denials of the tax-exemption applications, ruling that the court was constrained by Meijer, Inc v State Tax Comm, 66 Mich App 280; 238 NW2d 582 (1975), to conclude that the test-cell facilities met the part 59 requirements because they were ancillary equipment for the control of pollution. The city of Dearborn, an intervening respondent, filed four separate applications in the Court of Appeals, arguing that the circuit court had improperly overturned fact-finding of the administrative agency.
In Detroit Diesel’s suit, the Wayne Circuit Court affirmed the STC’s decision because there was competent, material, and substantial evidence supporting the STC’s conclusion that the test cells and the Equinox Line do not actually remove pollution, but rather operate for the primary purpose of producing engines for sale. Detroit Diesel applied for leave to appeal in the Court of Appeals.
*246 In DaimlerChrysler’s suits, the Oakland Circuit Court affirmed the STC’s decisions, holding that there was competent, material, and substantial evidence for the STC’s conclusion that the test cells do not actually remove pollution and that the primary purpose for the test cells was to ensure that DaimlerChrysler’s vehicles were sellable. DaimlerChrysler applied for leave to appeal in the Court of Appeals.
The Court of Appeals issued an order consolidating all the appeals. The Court of Appeals, in a published opinion, held that all the test-cell facilities met the requirements of the part 59 tax exemption as a matter of law, but that Detroit Diesel’s Equinox Line facility did not.[4] The panel concluded that the test cells qualified for tax-exemption certificates because petitioners installed the test cells solely to ensure compliance with EPA emission standards. Thus, the test cells were installed for the primary purpose of controlling or disposing of air pollution and were designed and operated primarily for the control, capture, and removal of pollutants from the air. The panel held that Detroit Diesel’s Equinox Line did not meet the requirements of part 59 because it was operated primarily for production of a new type of engine for sale, not for the control, capture, or removal of pollutants in the air. The Court of Appeals also rejected Detroit Diesel’s claims that the STC’s hearing process violated the Administrative Procedures Act (APA), MCL 24.201 et seq., and due-process principles.
The DEQ and the STC filed separate applications for leave to appeal in each case. Detroit Diesel cross-appealed. The city of Auburn Hills appealed the decision regarding DaimlerChrysler’s Auburn Hills test *247 cell, and the city of Dearborn appealed the decision involving Ford’s Dearborn test cell. This Court granted all the applications for leave to appeal or cross-appeal.[5]
II. STANDARD OF REVIEW
This case involves the interpretation of part 59 of NREPA. This Court reviews questions of statutory interpretation de novo.[6] Clear and unambiguous statutory language is given its plain meaning and is enforced as written.[7]
Further, this case involves review of the STC’s and the DEQ’s interpretation and application of part 59. This Court reviews final decisions from administrative agencies by determining whether they are authorized by law and whether they are supported by competent, material, and substantial evidence on the whole record.[8] Although this Court affords respectful consideration to the construction of statutory provisions by any particular department of the government, the department’s interpretation is not binding on this Court and cannot be used to overcome the statute’s unambiguous meaning.[9] Furthermore, this Court owes no deference to an agency determination when an agency issues contradictory rulings on the same issue and changes its policy mid-course, as the DEQ has in this case. “ ‘Substantial evidence’ is evidence that a reasonable person would accept as sufficient to support a conclusion. While this *248 requires more than a scintilla of evidence, it may be substantially less than a preponderance.”[10]
III. PART 59 TAX EXEMPTIONS
Part 59 of NREPA provides real property, personal property, sales, and use tax exemptions for certain facilities designed to reduce air pollutants. Tax exemptions are strictly construed against the taxpayer.[11] However, the Court interprets the statutory language creating the tax exemption according to common and approved usage.[12] In order to qualify for the tax exemptions under part 59, the property in question must first meet the definition of “facility” in part 59. Part 59 defines “facility” as follows:
[Mlachinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if released would render the *249 air harmful or inimical to the public health or to property within this state. Facility includes an incinerator equipped with a pollution abatement device in effective operation. Facility does not include an air conditioner, dust collector, fan, or other similar facility for the benefit of personnel or of a business. Facility also means the following, if the installation was completed on or after July 23, 1965:
(a) Conversion or modification of a fuel burning system to effect air pollution control. The fuel burner portion only of the system is eligible for tax exemption.
(b) Installation of a new fuel burning system to effect air pollution control. The fuel burner portion only of the system is eligible for tax exemption.
(c) A process change involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part. The maximum cost allowed shall be 25% of the cost of the new process unit but shall not exceed the cost of the conventional control equipment applied on the basis of the new process production rate on the preexisting process. [MCL 324.5901 (emphasis added).]
After property has been designated as a facility under MCL 324.5901, the facility must meet the following further requirements in order to qualify for tax exemptions:
If the department finds that the facility is designed and operated primarily for the control, capture, and removal of pollutants from the air, and is suitable, reasonably adequate, and meets the intent and purposes of part 55 and rules promulgated under that part, the department shall notify the state tax commission, which shall issue a certificate. ... [MCL 324.5903.]
Therefore, property must meet the definition of “facility” under MCL 324.5901, and, under MCL 324.5903, (1) be “designed and operated primarily for the control, capture, and removal of pollutants from the air,” (2) be “suitable, reasonably adequate,” and (3) “meet the *250 intent and purposes of part 55” in order to qualify for tax exemptions under part 59.
A. TEST-CELL FACILITIES
I dissent from the lead opinion, and would hold that the petitioners’ test-cell facilities qualify for tax exemptions under part 59. In order to determine whether the petitioners’ test-cell facilities qualify for tax exemptions, it is necessary to first determine whether the test-cell facilities are “facilities” under MCL 324.5901. MCL 324.5901 unambiguously defines a facility as including “machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if released would render the air harmful or inimical to the public health or to property within this state.” (Emphasis added.)
Accordingly, it is necessary to determine whether the test cells were installed or acquired for the primary purpose of controlling or disposing of air pollution in Michigan. An ordinary meaning of “control” means to “exercise restraint or direction over; dominate, regulate, or command; to hold in check; curb.”[13] It is undisputed that petitioners installed and operated the test cells for the sole purpose of regulating emissions to meet federal standards and curb emissions output in the engines and vehicles produced. Regulating and curbing emissions is thus a method of controlling emissions.
The STC and the DEQ argue that petitioners did not install the test cells with the primary motive of controlling emissions because the test cells were installed to *251 create vehicles conforming to EPA regulations. However, the petitioners’ motive behind installing the test cells is not determinative of the primary purpose of the test cells. It is immaterial that the test cells were created so that the petitioners’ engine and vehicle emissions would satisfy federal emissions regulations:
The use of the words “primary purpose” in § 1 [now MCL 324.5901], and “operated primarily for” in § 3 [now MCL 324.5903] of the Air Exemption Act [now part 59] evidences a legislative concern with the primary purpose served by the facility for which exemption is sought. This purpose need not, necessarily, align with the motivation of the persons installing, acquiring or operating the facilities[14]
The test cells primarily operate to regulate and reduce air pollutants; for tax-exemption purposes, it does not matter why the test cells were implemented.
The STC and the DEQ additionally argue that the test-cell facilities are not “facilities” under MCL 324.5901 because the test-cell facilities actually create a small amount of pollution through the testing process. This creation of a small amount of pollution does not, however, alter the primary purpose of the test cells, which is to control pollution through prevention. As petitioners point out, many pollution-control machines also create pollution. For example, mechanical balers and compactors, such as those in Meijer, supra, release some exhaust during recycling operations.
The STC and the DEQ also argue that the clause “within this state” in MCL 324.5901 bars tax exemption for petitioners because the exhaust emissions that the test cells reduce are released primarily outside Michigan. This argument is unpersuasive. First, the STC and *252 the DEQ did not preserve this issue for appeal because they did not raise and argue it before the Court of Appeals. Furthermore, the phrase “within this state” modifies the conjoined phrases “to the public health or to property,” not “the primary purpose of controlling air pollution.” In other words, the statute merely requires that the “primary purpose” of the machinery installed be to “control... air pollution,” not to specifically control air pollution that would be released primarily within this state, as the STC and the DEQ argue. The statute then refines the category of “air pollution” to refer to a subcategory of pollution “that if released would render the air harmful or inimical to the public health or to property within this state.” This phrase indicates that if the pollution that has been controlled were to be released, that pollution must be of the type that would be harmful to public health or property in Michigan in order for machinery that controls such air pollution to qualify as a “facility.” Thus, if the test cells at issue were installed for the primary purpose of controlling air pollution, and if the release of the controlled air pollution would render the air harmful to public health or property within Michigan, then the test cells qualify as a “facility.” Here, the primary purpose of the test cells is to reduce air pollution by testing the emissions released by vehicles. Moreover, there is no question that vehicles and engines manufactured by the petitioners are sold in Michigan, and that the pollution controlled by the test cells is harmful to the public health. It stands to reason then that the vehicles and engines sold in Michigan emit fewer noxious pollutants into Michigan’s atmosphere than they would have released without the test cells. Therefore, the test cells control air pollution that, if released, “would render the air harmful or inimical to the public health or to *253 property within this state.” Accordingly, the test cells are “facilities” under MCL 324.5901.[15]
Petitioners’ test-cell facilities were installed or acquired for the primary purpose of controlling or disposing of air pollution in Michigan because the test cells curb the spread of air pollution by ensuring that less pollution is released into the atmosphere in the first place; therefore, the test-cell facilities are “facilities” under MCL 324.5901.
The lead opinion argues that the test cells are not “facilities” because their primary purpose is to “test engines to ensure that petitioners have properly designed their engines to meet federal regulations so that they can sell them to consumers.” Ante at 227. However, this argument does not consider that without the federally mandated pollution regulations, petitioners would not need or have test cells, but would continue to operate without them. As petitioners point out, the test cells do not benefit petitioners’ businesses because conformance with EPA regulations increases expenses, resulting in higher vehicle and engine prices and reduced sales. Thus, the test cells were not installed to foster sales. Further, every business must comply with federal pollution regulations and every business is trying to sell something. Under the lead opinion’s interpretation, it appears that any business that complies with federal regulations is not entitled to a Michigan tax exemption because it could always be said that the business complied with federal regulations merely to sell its product to consumers. Under the lead opinion’s *254 interpretation, the only way a business would be entitled to a tax exemption is by philanthropically installing pollution-control equipment.
The test cells perform a fundamental function in the air-pollution-control process. They measure the levels of pollution emitted by engines in order to assure compliance with air-pollution regulations. If these levels of pollution exceed limits, the engines are not manufactured or sold, thereby curtailing excessive air pollution. Without the test cells, petitioners would be unable to ensure that their products are less polluting. Because testing emissions is an essential component of “controlling or disposing of air pollution,” and because the test cells were installed specifically to test pollution, the test cells can fairly be characterized as having been installed for “the primary purpose of controlling or disposing of air pollution” under MCL 324.5901. Moreover, under the lead opinion’s analysis, even compactors or balers, which were specifically held to qualify as “facilities” in Meijer, supra at 284, a decision with which the lead opinion apparently agrees, ante at 233-234, would not qualify as such because their “primary purpose” is to compress or bale material, rather than to “control” pollution.
Next, in order to qualify for tax exemptions under part 59, petitioners’ test-cell facilities must meet the requirements of MCL 324.5903. First, the test cells must be designed and operated primarily for the control, capture, and removal of pollutants from the air. In this case, the test cells were created for the sole purpose of reducing air pollutants emitted by the petitioners’ vehicles and engines, so that is the cells’ primary purpose.
As discussed earlier, the test cells control air pollutants directly by regulating the emissions output, and *255 indirectly by curbing the levels of pollutants released into the air in the first place. The test cells also capture and remove pollutants from the atmosphere. An ordinary meaning of “capture” is “to gain control of or exert influence over.”[16] Again, by regulating and curbing emissions, the test cells ensure that pollutants that would otherwise have been released into the atmosphere are never produced in the first place and thus control pollutants. An ordinary meaning of “remove” is “to move or shift from a place or position; to eliminate; do away with or put an end to.”[17] The test cells “eliminate” or “put an end to” air pollutants by preventing the pollutants from being created in the first place; were it not for the test cells, the abated pollutants would be in the atmosphere. Thus, the test cells operate primarily for the control, capture, and removal of air pollutants from the air.
Next, the test cells must be suitable and reasonably adequate for the purpose of reducing air pollutants and must also meet the intent and purposes of part 55 of NREPA to qualify for tax exemptions. “The suitability and adequacy . . . can be, and are, measured and tested through non-empirical studies based on accepted scientific principles and sound analysis. . . . [T]he resolution of this question is particularly well-suited to the expertise of the administrative agencies charged with assessing the technical suitability and adequacy of facilities for which exemption is sought.”[18] It is undisputed that the test cells function to help petitioners reduce and regulate the air pollutants that their vehicles and engines ultimately emit in order to meet federal stan *256 dards. As a result, the test cells are suitable and reasonably adequate for the purpose of reducing noxious air pollutants.
The purpose of part 55, by its own terms, is “to provide additional and cumulative remedies to prevent and abate air pollution.” The test cells, by ensuring that vehicle and engine emissions are clean enough to pass federal emissions standards, are designed to prevent and abate air pollution. Although the test cells were installed to ensure compliance with federal emissions regulations, they nonetheless accomplish the purpose of part 55 — to prevent and abate air pollution. The test cells meet the intent and purposes of part 55 of NREPA because the test cells function to prevent and abate noxious air pollutants.[19]
Petitioners’ test-cell facilities qualify for tax exemptions under part 59 because they meet the definition of “facility” in MCL 324.5901 and, under MCL 324.5903, are “designed and operated primarily for the control, capture, and removal of pollutants from the air,” are “suitable” or “reasonably adequate” at abating air pollution, and “meet the intent and purposes of part 55.”
The lead opinion argues that the test cells do not meet the requirements of MCL 324.5903 because they do not actually remove, control, and capture pollution caused by the operation of petitioners’ businesses. Ante at 228-229.1 disagree. The statute does not require that the exempt equipment itself physically remove air pol *257 lutants; rather, it merely requires that it be intended and operated primarily for that purpose. Moreover, the statute does not require that the pollution removed by the exempt equipment be that created by the operation of petitioners’ businesses', rather, the statute only refers to air pollution generally, without specifying any particular source of pollution. As explained earlier, the test cells here were intended primarily for, and functioned as, integral parts of a pollution-control process designed to regulate and curb air pollution produced by petitioners’ engines and vehicles. Therefore, the test cells were “designed and operated primarily for the control, capture, and removal of pollutants from the air.”
The lead opinion also sua sponte injects the argument that in order for a facility to meet the intent and purposes of part 55, it must regulate a “source” of pollution as defined by MCL 324.5501(t). Ante at 230. The lead opinion attempts to extrapolate the intent and purposes of “the whole of part 55,” ante at 230 n 24, by putting together bits and pieces of part 55. This method is flawed. MCL 324.5540 clearly and unambiguously states the purpose of part 55:
It is the purpose of this part to provide additional and cumulative remedies to prevent and abate air pollution. This part does not abridge or alter rights of action or remedies now or hereafter existing. This part or anything done by virtue of this part shall not be construed as estopping persons from the exercise of their respective rights to suppress nuisances or to prevent or abate air pollution.
We give this language its plain meaning and enforce it as written. Ayar v Foodland Distributors, 472 Mich 713, 715; 698 NW2d 875 (2005). The title and declared purpose of part 55 refer to air-pollution control generally. The lead opinion wrongly argues that the intent *258 and purposes of part 55 are not to prevent and abate air pollution generally, but instead to provide remedies in addition to private or citizen suits related to pollution control. Under the lead opinion’s faulty interpretation of the intent of part 55, only facilities that provide “additional remedies” would be eligible for a tax exemption under MCL 324.5903. The lead opinion fails to explain how pollution-control facilities other than the test cells can provide “additional remedies” that the test cells cannot.
Moreover, although part 55 mainly deals with stationary sources, this fact is not dispositive because part 55 also refers to nonstationary sources used for transportation.[20] The lead opinion discusses part 55’s definition of “source” in a vacuum, while ignoring the other defined terms in part 55. For example, part 55 also governs “process equipment,” which it defines as “all equipment, devices, and auxiliary components, including air pollution control equipment, stacks, and other emission points, used in a process.” MCL 324.5501(q) (emphasis added). Part 55 defines “air pollution control equipment” as “any method, process, or equipment that removes, reduces, or renders less noxious air contaminants discharged into the atmosphere.” MCL 324.5501(c). Test cells arguably qualify as “air pollution control equipment” because they ensure that vehicles *259 and engines do not exceed federal emissions standards, thus reducing air contaminants discharged into the atmosphere. The important point, however, is that the lead opinion identifies no language from part 55 or elsewhere stating that the “intent and purposes” of part 55 are to regulate pollution exclusively from “sources.”
Even if the lead opinion were correct that part 55 exclusively governs “sources,” this would not preclude the test cells from meeting the intent and purposes of part 55. The lead opinion neglects to quote the following part of the definition of “source” in part 55: “A source includes all the processes and process equipment under common control that are located within a contiguous area, or a smaller group of processes and process equipment as requested by the owner or operator of the source, if in accordance with the clean air act.” MCL 324.5501(t) (emphasis added). As discussed earlier, because a test cell qualifies as “air pollution control equipment,” it also qualifies as “process equipment,” and accordingly as a “source” as defined by part 55.
The lead opinion’s argument that part .55 is not intended to reduce motor-vehicle emissions because those emissions are covered by parts 61, 63, and 65 is misplaced. Ante at 232. Part 61 is not applicable because it merely prohibits marine vessels from blowing flues under certain conditions. Parts 63 and 65 include procedures for requiring certain motor vehicles in west and southeast Michigan that are more than one year old to be periodically inspected for emissions and obtain a certificate of compliance that would be necessary for registration renewal. Parts 63 and 65 do not include emissions standards for motor-vehicle engines during the design, manufacture, and sale stages, but only ensure that certain vehicles, which satisfy emissions standards when initially purchased, maintain a mini *260 mum level of emissions after one year on the road. Further, parts 63 and 65 do not currently even regulate motor-vehicle emissions in west and southeast Michigan because those parts of the state have apparently attained the national ambient air quality standards for ozone. See MCL 324.6306(2); MCL 324.6507(2). In sum, parts 61, 63, and 65 in no way detract from the intent and purposes of part 55, which are to generally prevent and abate air pollution, including by reducing that air pollution from motor-vehicle engines by regulating their design and manufacture before sale.
The lead opinion also ignores the provision that a facility qualifies for a tax exemption only if it “meets the intent and purposes of part 55 and rules promulgated under that part. . . MCL 324.5903 (emphasis added). Reading the “intent and purposes” language in context with the “rules promulgated” language[21] makes it clear that one of the intents and purposes of part 55 is to reduce pollution from motor vehicles. Part 55 expressly provides that “[t]he department shall promulgate rules for the purpose of doing all of the following: . . . (c) Controlling any mode of transportation that is capable of causing or contributing to air pollution.” MCL 324.5512(1)(c) (emphasis added). This provision supports the conclusion that the intent of part 55 is not confined to the reduction of pollution from stationary sources. Thus, the test cells both meet the intent and purposes of part 55 and comply with the rules promulgated under part 55 governing pollution created by motor vehicles.
*261 Moreover, the lead opinion errs by stating that our interpretation renders part of MCL 324.5903 “nugatory or mere surplusage.” Ante at 230. MCL 324.5903 requires that the “facility” be “designed and operated primarily for the control, capture, and removal of pollutants from the air, and [be] suitable, reasonably adequate, and meet[] the intent and purposes of part 55,” which are “to prevent and abate air pollution,” MCL 324.5540. The lead opinion argues that if “the ‘intent and purposes’ of part 55 are simply the reduction of air pollution, then [the second requirement of MCL 324.5903, that the facility meet this purpose,] adds nothing to the first requirement [of MCL 324.5903, that the facility control, capture, and remove pollutants from the air].” Ante at 230 n 23. I respectfully disagree. The second requirement indicates the purpose of the “facility,” i.e., “to prevent and abate air pollution,” while the first requirement describes the means by which this purpose is to be achieved, i.e., by “control[ling], captur[ing], and removing] pollutants from the air.” Thus, this interpretation does not render any part of this statute “nugatory or mere surplusage.”
B. DETROIT DIESEL’S EQUINOX LINE FACILITY
I concur with the lead opinion’s holding that Detroit Diesel’s Equinox Line facility does not qualify for tax exemptions under part 59 because the primary purpose of the Equinox Line is to produce engines, not to control or dispose of air pollution. In order to qualify for the tax exemption, the Equinox Line must meet the definition of “facility” under MCL 324.5901. MCL 324.5901 defines “facility,” in pertinent part, as follows:
[M]achinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or *262 disposing of air pollution that if released would render the air harmful or inimical to the public health or to property within this state. Facility includes an incinerator equipped with a pollution abatement device in effective operation. Facility does not include an air conditioner, dust collector, fan, or other similar facility for the benefit of personnel or of a business. Facility also means the following, if the installation was completed on or after July 23, 1965:
(c) A process change involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part. The maximum cost allowed shall be 25% of the cost of the new process unit but shall not exceed the cost of the conventional control equipment applied on the basis of the new process production rate on the preexisting process. [MCL 324.5901 (emphasis added).]
Thus, under MCL 324.5901, a “facility” may be either “machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if released would render the air harmful or inimical to the public health or to property within this state” or “[a] process change involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part.”
The Equinox Line does not satisfy the requirements of the tax exemption under MCL 324.5901 for a “facility” because the Equinox Line was not designed for the primary purpose of controlling or removing air pollutants. Unlike the test cells, which were installed for the primary and sole purpose of testing and controlling exhaust emissions, the Equinox Line was installed for the primary purpose of manufacturing engines. Although the Equinox Line assists in controlling and *263 disposing of air pollution by manufacturing less-polluting engines that meet EPA standards, this purpose is secondary. Instead, the primary purpose of the line remains manufacturing engines for sale. Just because a manufacturing facility is altered or built to assure compliance with environmental laws does not mean that its primary purpose of manufacturing is transformed into a new primary purpose of controlling air pollution. The latter purpose remains secondary.[22] Therefore, because, unlike the test cells, the Equinox Line was not installed primarily to control or dispose of air pollution, I concur with the lead opinion’s holding that Detroit Diesel’s Equinox Line is not a facility under MCL 324.5901. As a result, the Equinox Line does not qualify for tax exemptions under part 59.[23]
Although the lead opinion does not address this argument, Detroit Diesel’s argument that the Equinox Line is a “facility” because it is “[a] process[24] change involving production equipment made to satisfy the *264 requirements of part 55 and rules promulgated under that part” is not valid.[25] The stated purpose of part 55 is to prevent and abate air pollution.[26] Detroit Diesel did not install the Equinox Line specifically to meet the requirements of part 55, but rather installed the Equinox Line to manufacture engines that comply with EPA requirements. That the installation of the Equinox Line furthers the purpose of part 55 does not mean that it was done to satisfy the requirements of part 55. As a result, the Equinox Line is not a “facility” under MCL 324.5901 because it is not “[a] process change involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part.”
Detroit Diesel’s Equinox Line does not qualify for tax exemptions because the Equinox Line is neither “machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if released would render the air harmful or inimical to the public health or to property within this state” nor “[a] process change involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part.” As a result, the Equinox Line is not a facility under MCL 324.5901 and does not qualify for a tax exemption.
IV DUE PROCESS
I do not find Detroit Diesel’s due-process argument persuasive. Detroit Diesel argues that the STC’s hear *265 ing process violated due process because the STC announced at the beginning of the hearing: “It is the position of the State Tax Commission after consultation with legal counsel that it has neither the authority nor the technical expertise to override a determination by the DEQ in regards to whether particular assets qualify for an air pollution control exemption.” Detroit Diesel argues that the STC, by abdicating its role as a true decision maker, deprived Detroit Diesel of a meaningful hearing.
Generally, due process in civil cases requires notice of the nature of the proceedings and an opportunity to be heard in a meaningful time and manner by an impartial decisionmaker. Because the collection of a tax constitutes a deprivation of property, a state must provide sufficient procedural safeguards to satisfy due process requirements. But states are afforded great flexibility in satisfying the requirements of due process in the field of taxation. Due process is satisfied when a taxpayer has “a fair opportunity to challenge the accuracy and legal validity of their tax obligation and a clear and certain remedy for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one.[27]
Here, part 59 provides that an applicant for a tax exemption is entitled to a hearing:
Before issuing a certificate, the state tax commission shall seek approval of the department and give notice in writing by certified mail to the department of treasury and to the assessor of the taxing unit in which the facility is located or to be located, and shall afford to the applicant and the assessor an opportunity for a hearing.[28]
Under MCL 324.5902(1), a petitioner sends an application for a tax-exemption certificate to the STC. MCL *266 324.5902(2) requires the STC to both allow the applicant an opportunity for a hearing and forward the application to the DEQ for approval. If the hearing concludes before the DEQ makes a determination, the STC must then refer the matter to the DEQ for consideration of factual developments at the hearing and to seek approval of the tax certificate. If the hearing concludes after the DEQ makes a determination, as in the instant case, the STC may grant or deny the certificate on the basis of the original DEQ determination and the developments at the hearing, or refer the matter again to the DEQ for consideration of any new information developed at the hearing. The DEQ, not the STC, has the authority and expertise to determine whether the facility is entitled to a tax exemption under part 59.
MCL 324.5903 provides, in pertinent part:
If the department finds that the facility is designed and operated primarily for the control, capture, and removal of pollutants from the air, and is suitable, reasonably adequate, and meets the intent and purposes of part 55 and rules promulgated under that part, the department shall notify the state tax commission, which shall issue a certificate. [Emphasis added.]
MCL 324.5908 provides that although the STC may adopt rules considered necessary for administration of part 59 of NREPA, “[tjhese rules shall not abridge the authority of the department to determine whether or not air pollution control exists within the meaning of this part.” Thus, although the STC is the agency that actually issues the tax-exemption certificate, it must defer to the DEQ’s determination whether a petitioner is entitled to a tax exemption under part 59.
Further, even assuming that the STC can grant a tax-exemption certificate without the DEQ’s approval, *267 the hearing conducted by the STC in this case complied with due process. As required by MCL 324.5902(2), the STC forwarded Detroit Diesel’s application for tax-exemption certificates to the DEQ for approval. After receiving the DEQ’s determination that Detroit Diesel was not entitled to the tax exemptions, the STC afforded Detroit Diesel an opportunity for a hearing. The hearing at the STC was not meaningless. The STC gave Detroit Diesel a full hearing in which it was allowed to present evidence and argue that the STC was not bound by the DEQ findings. Detroit Diesel identifies no evidence or legal argument that it was prevented from submitting. Although the STC stated at the outset of the hearing that it lacked the authority to override a DEQ determination regarding an air-pollution-control tax exemption, the STC did not conduct the hearing merely to rubber-stamp the DEQ’s earlier decision. Rather, the STC conducted the hearing to gather additional information and forward this information to the DEQ for further consideration and another determination. Unfortunately for Detroit Diesel, the DEQ again decided that Detroit Diesel was not entitled to the tax exemptions. But because the DEQ considered the information developed at the hearing to determine whether to change its determination, the hearing was not meaningless. Thus, Detroit Diesel was afforded due process during the STC proceedings.
V CONCLUSION
In conclusion, I dissent from the lead opinion and would affirm the Court of Appeals. I would hold that petitioners’ test-cell facilities qualify for tax exemptions under part 59 because they meet the definition of “facility” in MCL 324.5901 and, under MCL 324.5903, are “designed and operated primarily for the control, *268 capture, and removal of pollutants from the air,” are “suitable” or “reasonably adequate” at abating air pollution, and “meet the intent and purposes of part 55.” I concur with the lead opinion’s holding that Detroit Diesel’s Equinox Line does not qualify for tax exemptions under part 59 because the Equinox Line is not a “facility” under MCL 324.5901. Lastly, I would hold that Detroit Diesel was not deprived of due process during the STC proceedings.
Corrigan and Markman, JJ., concurred with Weaver, J.

 MCL 324.5901 et seq.

 See 42 USC 7401 et seq.

 MCL 324.5901 et seq.

 Ford Motor Co v State Tax Comm, 274 Mich App 108; 732 NW2d 591 (2007).

 DaimlerChrysler Corp v State Tax Comm, 480 Mich 880 (2007).

 Ayar v Foodland Distributors, 472 Mich 713, 715; 698 NW2d 875 (2005).

 Id. at 716.

 Reed v Hurley Medical Ctr, 153 Mich App 71, 75; 395 NW2d 12 (1986); MCL 24.306.

 Catalina Marketing Sales Corp v Dep’t of Treasury, 470 Mich 13, 23-24; 678 NW2d 619 (2004).

 Dep’t of Community Health v Risch, 274 Mich App 365, 372-373; 733 NW2d 403 (2007) (citation and quotation marks omitted). The city of Dearborn argues in its application that the STC’s decision to deny Ford’s application for a tax exemption was supported by competent, material, and substantial evidence on the record and should therefore not be disturbed on appeal. We reject this argument because it is based on the incorrect assumption that the circuit court reversed the STC on a purely factual basis, instead of a legal one. On appeal, the Court of Appeals did not consider whether the STC’s decision to deny Ford’s application for a tax exemption was unsupported by factual evidence. Rather, the Court of Appeals held that the STC’s legal rulings were erroneous as a matter of law. Under MCL 24.306 of the APA, a reviewing court can set aside the STC’s decision on a legal basis or on a factual basis if the facts are not supported by competent, material, and substantial evidence. Therefore, the Court of Appeals was free to rule that the STC’s decision was legally erroneous, even if it was supported by competent, material, and substantial evidence.

 Elias Bros Restaurants, Inc v Dep’t of Treasury, 452 Mich 144, 150; 549 NW2d 837 (1996).

 Id.

 Webster’s Universal College Dictionary (1997).

 Covert Twp Assessor v State Tax Comm, 407 Mich 561, 580-581; 287 NW2d 895 (1980).

 MCL 324.5901 does not require that pollution be reduced solely within Michigan. As long as petitioners sell engines and vehicles in Michigan, thereby reducing harmful pollution in Michigan, the fact that they also sell engines and vehicles in other states, thereby reducing pollution in those states as well, does not prevent them from qualifying for the instant tax exemption.

 Random House Webster’s College Dictionary (1997).

 Id.

 Covert Twp, 407 Mich at 582.

 Covert Twp agreed with the STC’s holding that the intent and purposes of the predecessor to part 55 “ ‘are served by pollution control facilities constructed within the State of Michigan whether required by reason of federal or state regulation.... It is the fact that pollution control is provided that is important and not whether that pollution control is provided in response to state or federal regulation.’ ” Id. at 579 (emphasis in original).

 See, e.g., MCL 324.5501ft)) (“With respect to any mode of transportation, nothing in this part or in the rules promulgated under this part shall be inconsistent with the federal regulations, emission limits____”); MCL 324.5513 (“Notwithstanding any other provision of this part or the rules promulgated under this part, car ferries having the capacity to carry more than 110 motor vehicles and coal-fueled trains used in connection with tourism or an historical museum or carrying works of art or items of historical interest are not subject to regulation under this part.”); MCL 324.5512(1) (“The department shall promulgate rules for purposes of doing all of the following:... (c) Controlling any mode of transportation that is capable of causing or contributing to air pollution.”).

 This Court must consider “both the plain meaning of the critical word or phrase as well as ‘its placement and purpose in the statutory scheme.’ ” Sun Valley Foods Co v Ward, 460 Mich 230, 237; 596 NW2d 119 (1999), quoting Bailey v United States, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

 To further illustrate, we offer the following hypothetical situation: if a manufacturing plant builds a new office building for pollution-control engineers charged with controlling and disposing of air pollution released by the plant and its products, the office building would not qualify as a “facility” under MCL 324.5901. That is so because the primary purpose of the office building is to provide offices for employees, not to control or reduce pollution. The fact that the office building provides necessary accommodations for pollution-control engineers, and, therefore, indirectly or secondarily aims at controlling air pollution, does not transform its primary purpose.

 Detroit Diesel also is not entitled to a tax exemption because the Equinox Line does not satisfy MCL 324.5903, which mandates that a “facility is designed and operated primarily for the control, capture, and removal of pollutants from the air” in order to qualify for a tax exemption. The Equinox Line was designed for the primary purpose of manufacturing engines for sale, not for the purpose of abating pollution.

 Part 55 defines “process” as “an action, operation, or a series of actions or operations at a source that emits or has the potential to emit an air contaminant.” MCL 324.5501(p). Part 55 defines “process equip *264 ment” as “all equipment, devices, and auxiliary components, including air pollution control equipment, stacks, and other emission points, used in a process.” MCL 324.5501(q).

 MCL 324.5901(c).

 MCL 324.5540.

 By Lo Oil Co v Dep’t of Treasury, 267 Mich App 19, 29; 703 NW2d 822 (2005) (citations and quotation marks omitted).

 MCL 324.5902(2) (emphasis added).